[S.F. No. 23223. In Bank. July 28, 1975.]

UNITED FARM WORKERS OF AMERICA, AFL-CIO, Petitioner, v. THE SUPERIOR COURT OF SANTA CRUZ COUNTY, Respondent; WILLIAM BUAK FRUIT COMPANY, INC., Real Party in Interest.

**COUNSEL**

Jerome Cohen and Sanford N. Nathan for Petitioner.

Fred Okrand, John D. O'Loughin, Jill Jakes, Mark D. Rosenbaum, Daniel C. Lavery and Joseph Remcho as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

William S. Marrs for Real Party in Interest.

**OPINION**

**MOSK, J.**—In this labor controversy we consider the constitutionality of the practice of ex parte issuance of temporary restraining orders affecting substantial free speech interests, without a showing that the party seeking the injunction made a reasonable, good faith effort to afford the

opposing party or counsel notice and opportunity to be heard. As will appear, we conclude that the ex parte issuance of temporary restraining orders in such circumstances violates the freedom of speech guarantees of both the United States Constitution (1st & 14th Amends.) and the Constitution of the State of California (art. I, § 2).

The relevant facts can be summarized briefly. On September 27, 1974, the real party in interest, William Buak Fruit Company (hereinafter referred to as the fruit company), filed a verified complaint for injunctive relief, accompanied by three supporting declarations, in the Santa Cruz Superior Court (respondent herein). Named as the defendants in that action were the United Farm Workers of America, AFL-CIO (an unincorporated association functioning as a labor organization, and petitioner in the instant proceeding), and certain of its members.

In its complaint the fruit company alleged that the defendants had engaged in "mass picketing" at its orchards and on its property, with "such an aggregation of pickets thereat as to unduly interfere with ingress and egress from said premises . . . [and] to such an extent as to reasonably induce fear of physical molestation and violence." The fruit company also alleged that the defendants had "trespassed" on its property "for the purpose of coercing [fruit company] employees . . . to cease working . . . [and] in such a manner as to reasonably induce fear of physical molestation." It further alleged that in connection with the mass picketing and trespassing the defendants had threatened, or caused to be threatened, with bodily harm, workers who sought, accepted, or continued harvesting work in its orchards. The requisite danger of irreparable injury cited to support the request for injunctive relief was potential interference with the harvesting of an apple crop alleged to be worth in excess of $500,000. The supporting declarations alleged the value of the apple crop, the affiants' personal observation of mass picketing, and reports by crew leaders and workers of "threats," "coercion," and "trespass" by the defendants.[1]

None of the defendants, including petitioner, was given notice, either formal or informal, of the request for the temporary restraining order, and as a result none appeared, either in person or by counsel, before the

---

[1] The verified answer to the complaint, filed October 17, 1974, denied each of the foregoing allegations. Three supporting declarations filed with the answer alleged that the affiant had been on the picket line and had not witnessed any violence or heard any threats of violence with the exception of threats and violence initiated by members of a competing labor organization, and, as one of the affiants alleged, by one of the fruit company's foremen.

trial judge. The fruit company made no showing that it had been unable to notify defendants or their counsel, nor did it allege that it had attempted to do so. On September 30, 1974, the court issued a temporary restraining order limiting picketing at the apple ranch by members of the United Farm Workers, and restricting access to the migrant labor camp located on the fruit company's property. The defendants were first notified of the proceedings when served later that day with the summons, complaint, temporary restraining order, and order to show cause.[2]

On October 3, 1974, petitioner moved to dissolve the temporary restraining order on the grounds that it had been issued ex parte and without notice to any defendants and was thus unconstitutional, and that the fruit company had not made a factual showing sufficient to justify injunctive relief. The court denied the motion, and continued the order in effect.

In this proceeding, petitioner seeks a writ of prohibition commanding the Santa Cruz Superior Court to refrain from enforcing or continuing in effect the temporary restraining order.

■ An initial question of mootness arises because the superior court replaced the temporary restraining order with a preliminary injunction after an adversary hearing on October 17, 1974. (See Code Civ. Proc., § 527; 2 Witkin, Cal. Procedure (2d ed. 1970) Provisional Remedies, § 87, p. 1522.) Petitioner contends, however, that in recent years a number of trial courts have issued and enforced similar ex parte orders affecting First Amendment rights, and asserts that the practice is not unusual. Such orders can and do have a critical and far-reaching impact on labor disputes in this state. Yet because of their limited duration, orders of this nature elude appellate review. Because this case thus "poses an issue of broad public interest that is likely to recur," we exercise what has been described as our "inherent discretion to resolve that issue." (*In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737].)

We are reinforced in this conclusion by the United States Supreme Court's similar rejection of mootness contentions in *Carroll* v. *Princess*

[2]The temporary restraining order enjoined defendants, and all persons acting at their direction or in concert with them, from entering upon the fruit company's property, from physically obstructing persons or vehicles entering or leaving the property, from threatening fruit company employees, customers, or contractors with physical injury or property damage, or from inflicting such harm. The order also limited the number of pickets allowed at or near fruit company property or at places where the fruit company recruits, assembles or loads workers, and required the permissible number of pickets allowed at or near fruit company property to be spaced at certain minimum intervals.

*Anne* (1968) 393 U.S. 175 [21 L.Ed.2d 325, 89 S.Ct. 347]. There the petitioners challenged the procedural validity of an ex parte temporary restraining order forbidding the continuation of a rally and speeches advocating racial supremacy. The Supreme Court held, inter alia, that although the order under attack had long since expired, the issue of its validity was clearly not moot. Quoting from *So. Pac. Terminal Co.* v. *Int. Comm. Comm.* (1911) 219 U.S. 498 [55 L.Ed. 310, 31 S.Ct. 279], Justice Fortas explained, " '[judicial] consideration ought not to be . . . defeated, by short term orders, capable of repetition, yet evading review. . . .' *Id.,* at 515." (*Id.* at p. 179 [21 L.Ed.2d at p. 330].)[3]

We turn therefore to the merits of the controversy. Petitioner contends that the United States Supreme Court's unanimous holding in *Carroll* v. *Princess Anne* (1968) *supra,* 393 U.S. 175, compels the invalidation of the temporary restraining order because it was issued ex parte without a showing that the fruit company made a reasonable, good faith effort to afford petitioner or the other defendants or their counsel notice and an opportunity to be heard. The *Carroll* ruling condemns such an ex parte process when the order in question affects First Amendment rights. (See also *Anderson* v. *Dean* (N.D.Ga. 1973) 354 F.Supp. 639, 642-643.)

While acknowledging that the factual circumstances in the matter before us differ somewhat from those in *Carroll,* we find the reasoning in that decision instructive on a number of points. It will be remembered

---

[3]We are not oblivious to the distinctions which can be drawn between this case and *Carroll* on the mootness issue. First, in *Carroll* it appeared that the decision of the Maryland Court of Appeals upholding the validity of the ex parte temporary restraining order was "continuing to play a substantial role in the response of officials" to the petitioners' activities. (Fn. omitted; 393 U.S. at p. 178 [21 L.Ed.2d at p. 329].) Second, a treatment of the merits of the controversy in *Carroll* was "particularly appropriate" in light of the requirement the United States Supreme Court had just announced in *Walker* v. *City of Birmingham* (1967) 388 U.S. 307 [18 L.Ed.2d 1210, 87 S.Ct. 1824], that persons seeking to challenge the constitutional validity of an ex parte injunction must seek judicial redress before contemplating disobedience of the order. But the rule in California is otherwise. In this state a person affected by an injunctive order which exceeds the jurisdiction of the issuing court has the choice of complying with the order and bringing a judicial challenge, or disobeying it and subsequently attacking its validity when he is charged with contempt. (*In re Berry* (1968) 68 Cal.2d 137, 148-149 [65 Cal.Rptr. 273, 436 P.2d 273].)

These distinctions do not, however, negate our determination that this case is not moot. We find sufficient rejoinder to the first distinction in the fact that requests in California trial courts for ex parte restraining orders in the First Amendment area are recurring, and in response to the second distinction simply note that our intention in *Berry* was to afford persons affected by such orders a choice of alternatives, not to force those persons into disobedience of suspect injunctions in attempting to prolong the controversy so as to circumvent potential mootness barriers.

that *Carroll* involved the ex parte issuance of a temporary restraining order prohibiting the continuation of a rally and speeches advocating racial supremacy; this case involves the ex parte issuance of a temporary restraining order limiting labor picketing and access to migrant labor camps. While the fruit company correctly contends that in certain respects the courts have treated labor picketing differently from other activities arguably protected by the First Amendment, the difficulties inherent in an ex parte proceeding are common to both areas. We focus first on these procedural difficulties.

Two basic defects are typical of ex parte proceedings. The first is a shortage of factual and legal contentions. Not only are facts and law from the defendant lacking, but the moving party's own presentation is often abbreviated because no challenge from the defendant is anticipated at this point in the proceeding. The deficiency is frequently crucial, as reasonably adequate factual and legal contentions from diverse perspectives can be essential to the court's initial decision on whether or not the circumstances warrant a temporary restraining order.

In the present case, for example, the court had before it only the verified complaint and three one-page affidavits signed by persons whose interests precisely paralleled those of the fruit company requesting injunctive relief.[4] Furthermore, these affidavits consisted in large part of conclusionary declarations and statements which, if offered in testimony by a witness at trial, could be excluded as hearsay.[5] However, because the proceeding was ex parte defense counsel had no opportunity to present counteraffidavits or argument.

This lack of opportunity to make an opposing presentation is in itself enough to render suspect ex parte proceedings affecting First Amend-

---

[4]The affidavits were signed by the secretary of the fruit company, a farm labor contractor who had agreed to supply workers for the fruit company, and the fruit company's ranch foreman.

The possible bias of parties signing verified complaints and affidavits in labor dispute cases and the pro forma nature of their factual allegations have long been recognized by commentators as a source of procedural difficulty. (See, e.g., Frankfurter & Greene, The Labor Injunction (1930) at pp. 34-35, 65, 201 ("The necessity of finding the facts quickly from sources vague, embittered and partisan, colored at the start by the passionate intensities of a labor controversy, calls at best for rare judicial qualities. It becomes an impossible assignment when judges rely solely upon the complaint and affidavits of interested or professional witnesses" (*id.* at p. 201)); Aaron & Levin, *Labor Injunctions in Action: A Five-Year Survey in Los Angeles County* (1951) 39 Cal.L.Rev. 42, 48-49.)

[5]See *McKay* v. *Retail Auto S. L. Union No. 1067* (1940) 16 Cal.2d 311, 320 [106 P.2d 373], in which this court held, inter alia, that a plaintiff must make a clear and detailed showing of specific facts justifying equitable relief, and applied the rule to a suit for injunction in a labor controversy.

ment rights.[6] As the United States Supreme Court pointed out in *Carroll*, "The facts in any case involving a public demonstration are difficult to ascertain and even more difficult to evaluate. Judgment as to whether the facts justify the use of the drastic power of injunction necessarily turns on subtle and controversial considerations and upon a delicate assessment of the particular situation in light of legal standards which are inescapably imprecise. In the absence of evidence and argument offered by both sides and of their participation in the formulation of value judgments, there is insufficient assurance of the balanced analysis and careful conclusions which are essential in the area of First Amendment adjudication." (Fns. omitted; 393 U.S. at p. 183 [21 L.Ed.2d at p. 332].)

The second major defect which often inheres in the ex parte issuance of a restraining order affecting First Amendment rights relates to the framing of such orders. Even if some form of restraining order is warranted, the fact that only the party seeking to circumscribe First Amendment activity is present to assist in the drafting of the order may result in an injunction which sweeps more broadly than necessary and violates First Amendment liberties.[7]

When enjoining activities in the sensitive area of First Amendment freedoms, courts must draft temporary restraining orders "couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." (*Carroll,* at p. 183 of 393 U.S. [at pp. 332-333 of 21 L.Ed.2d]; accord, *United Farm Workers Organizing Committee* v. *Superior Court* (1971) 4 Cal.3d 556, 570 [94 Cal.Rptr. 263, 483 P.2d 1215]; *In re Berry* (1968) *supra,* 68 Cal.2d 137, 155.) The difficulty in doing so is compounded if a court is unaided by an opposing presentation.

Having catalogued the two elementary procedural shortcomings of an ex parte order affecting First Amendment rights, we turn now to an analysis of the ways in which the temporary restraining order at issue here affected such rights. We conclude that it did so in two distinct respects.

---

[6]For literary convenience we frequently refer to "First Amendment rights." In so doing we imply no exclusive reliance upon the United States Constitution. Indeed, as indicated *infra,* we bottom our conclusion on provisions of the California Constitution, particularly article I, section 2, thereof.

[7]See, for example, the ex parte temporary restraining order invalidated in *In re Berry* (1968) *supra,* 68 Cal.2d 137, for vagueness, overbreadth, and failure to afford due process.

First, the order affected First Amendment rights by limiting access to the migrant labor camp on the fruit company's property. The order restrained defendants, and all persons acting at their direction or in concert with them, from entering upon the fruit company's property, including the property on which the farm labor camp was situated. Many courts have recognized a First Amendment right of access which belongs both to labor camp inhabitants and to union organizers and attorneys who seek to visit them. We are persuaded by the reasoning of those decisions, and join in their reading of the First Amendment. (*Petersen* v. *Talisman Sugar Corporation* (5th Cir. 1973) 478 F.2d 73; *Velez* v. *Amenta* (D.Conn. 1974) 370 F.Supp. 1250; *United Farm Workers Union, AFL-CIO* v. *Mel Finerman Co.* (D.Colo. 1973) 364 F.Supp. 326; *Franceschina* v. *Morgan* (S.D.Ind. 1972) 346 F.Supp. 833; *Folgueras* v. *Hassle* (W.D.Mich. 1971) 331 F.Supp. 615; but cf. *In re Asociacion de Trabajadores Agricolas de Puerto Rico* (D.Del. 1974) 376 F.Supp. 357.) Recent cases excluding noncustomers from shopping centers are not apposite. For example, the majority in *Diamond* v. *Bland* (1974) 11 Cal.3d 331 [113 Cal.Rptr. 468, 521 P.2d 460], made it abundantly clear they were not changing the law involving labor disputes (*id.* at p. 334, fn. 3). A labor housing facility is not, of course, the equivalent of a prison isolation block, impervious to visitation. Indeed, the trial judge here, after ultimately holding adversary proceedings, permitted reasonable access to the private farm labor housing.[8]

Second, the order affected First Amendment rights by limiting picketing. The order enjoined all but a restricted number of pickets, and required that number to be spaced at certain intervals. The fruit company contends the order curtailed only unlawful picketing, and therefore did not affect First Amendment freedoms. The company argues that in instances in which violence is alleged courts can issue ex parte injunctions prohibiting mass picketing without entering into First Amendment adjudication.

This argument leads to analysis of a series of cases in which the United States Supreme Court and this court have each attempted to define the scope of First Amendment protection afforded to picketing—an activity the elements of which may extend beyond the guarantees of the First

---

[8]The preliminary injunction issued several weeks later modified total prohibition—in apparent response to objections and arguments made by defendants' counsel—to allow "two (2) persons . . . to enter upon the premises where plaintiff [fruit company] provides farm labor housing between the hours of 5 p.m. and 9:30 p.m. to conduct peaceful discussions." That such alteration in the restraint was later found desirable suggests the order might have been framed differently had both sides been heard originally.

Amendment. For present purposes, however, our consideration of these decisions is limited. We are not required to resolve, nor did the court in *Carroll* determine, the thorny problem of whether the injunction here in issue is itself justified, i.e., whether its substance comports with the requirements of the First Amendment. We determine only whether the challenged ex parte order affects, or in the words of *Carroll* is "in the area of," activity protected by the First Amendment.

Many United States and California Supreme Court opinions have recognized and reaffirmed constitutional protection for peaceful picketing. (See, e.g., *Thornhill* v. *Alabama* (1940) 310 U.S. 88 [84 L.Ed. 1093, 60 S.Ct. 736]; *Carlson* v. *California* (1940) 310 U.S. 106 [84 L.Ed. 1104, 60 S.Ct. 746]; *Food Employees* v. *Logan Plaza* (1968) 391 U.S. 308 [20 L.Ed.2d 603, 88 S.Ct. 1601]; *In re Bell* (1942) 19 Cal.2d 488 [122 P.2d 22]; *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921]; *In re Berry* (1968) *supra,* 68 Cal.2d 137.) *Thornhill* is the leading case, but as Justice Frankfurter pointed out 17 years later, the broad language of *Thornhill* was subsequently reassessed in a series of decisions "sustaining injunctions against peaceful picketing . . . when such picketing was counter to valid state policy in a domain open to state regulation." (*Teamsters Union* v. *Vogt, Inc.* (1957) 354 U.S. 284, 291 [1 L.Ed.2d 1347, 1352, 77 S.Ct. 1166].)

A cursory survey of these reassessments reveals that the *Thornhill* doctrine has yielded, for instance, in circumstances in which a California court enjoined peaceful picketing which had the unlawful objective of seeking to force an employer to discriminate on the basis of race in hiring practices (*Hughes* v. *Superior Court* (1950) 339 U.S. 460 [94 L.Ed. 985, 70 S.Ct. 718]), secondary boycott picketing was found in violation of the Texas antitrust laws (*Carpenters Union* v. *Ritter's Cafe* (1942) 315 U.S. 722 [86 L.Ed. 1143, 62 S.Ct. 807]), an Illinois court determined that repeated and extreme incidents of violence intermingled with picketing necessitated the enjoining of all picketing (*Drivers Union* v. *Meadowmoor Co.* (1941) 312 U.S. 287 [85 L.Ed. 836, 61 S.Ct. 552, 132 A.L.R. 1200]), Wisconsin decided to forbid mass picketing (*Allen Bradley Local* v. *Board* (1942) 315 U.S. 740 [86 L.Ed. 1154, 62 S.Ct. 820]), a Washington court prohibited picketing against a sole proprietor (*Teamsters Union* v. *Hanke* (1950) 339 U.S. 470 [94 L.Ed. 995, 70 S.Ct. 773, 13 A.L.R.2d 631]), and another Washington court enjoined picketing which it found coercive against the employees' right to choose their bargaining repre-

sentative (*Building Service Union* v. *Gazzam* (1950) 339 U.S. 532 [94 L.Ed. 1045, 70 S.Ct. 784]).

The inquiry, therefore, is whether this state has articulated a policy which allows the imposition of prior restraints on picketing in labor cases upon mere allegations of violence or threats of violence. A review of our case law negates the fruit company's contention that we have adopted such a rule. Rather, we have denied free speech protection to picketing in instances in which, after an adversary trial, the court has specifically found acts of violence or physical intimidation.[9] Short of such a trial, picketing may be curtailed or prohibited only after the defendant has had notice and an opportunity to be heard, or the applicant has made a reasonable and good faith effort to give such notice.

While the preceding discussion considers the pending controversy under the rubric of the First and Fourteenth Amendments to the United States Constitution, we reach the same result when we subject the ex parte issuance of a temporary restraining order in the area of rights defined by article I, section 2, of the California Constitution to independent scrutiny under the California charter. Labor organizing activities, including picketing, are equally protected by the free speech provisions of our state Constitution. (See, e.g., *In re. Porterfield* (1946) 28 Cal.2d 91, 114 [168 P.2d 706, 167 A.L.R. 675]; *In re Blaney* (1947) 30 Cal.2d 643, 648 [184 P.2d 892]; see generally Falk, *The State Constitution: A More Than "Adequate" Nonfederal Ground* (1973) 61 Cal.L.Rev. 273; *Project Report: Toward an Activist Role for State Bills of Rights* (1973) 8 Harv.Civ.Rights-Civ.Lib.L.Rev. 271.)

Finally, the fruit company argues that in cases involving the possibility of "great or irreparable injury" within the meaning of Code of Civil Procedure section 527, applicants for temporary restraining orders should not be required to furnish notice and opportunity to be heard. The company emphasizes that time is of the essence in agricultural labor disputes because an entire crop, if not harvested, can be lost in a few days or weeks. It further urges that a trial court can adequately cure the defects of an ex parte proceeding by providing an adversary hearing

---

[9]See, for example, *Steiner* v. *Long Beach Local No. 128* (1942) 19 Cal.2d 676, 681-682 [123 P.2d 20], in which this court upheld an injunction prohibiting all picketing. In *Steiner* the injunction issued after an adversary trial and pursuant to findings that defendant union officers and members combined their picketing activity with shadowing the strike replacements, their wives, and the trucks of companies hauling the employer's product, with repeated threats of physical assault and violence directed against the employer's business callers and strike replacements, and with rock-throwing.

*subsequently* to the issuance of the temporary restraining order. These contentions are unpersuasive, inasmuch as an equivalent delay of a few days or weeks in correcting an erroneously issued ex parte order can wholly destroy the economic impact of picketing. As this court observed in the context of another labor controversy, "It has been demonstrated that the granting of temporary injunctions in labor disputes usually has the effect of determining and terminating the entire controversy." (*McKay* v. *Retail Auto. S. L. Union No. 1067* (1940) *supra,* 16 Cal.2d 311, 330.)[10]

We conclude that in the present context both our state and federal Constitutions require either the giving of notice or the demonstration of a reasonable effort to do so prior to issuance of a temporary restraining order.[11] Given the importance of the First Amendment rights involved, the burden which this ruling places on the applicant for an order is relatively slight. He must merely make a reasonable effort in good faith to give notice, in either formal or informal fashion, to either the defendant or his counsel. This constitutional requirement must be read into the basic procedure prescribed by Code of Civil Procedure section 527, which sets forth the steps necessary to obtain injunctive relief.[12]

The circumstances will ordinarily call for a prompt opportunity to be heard; indeed, on rare occasions the situation may be sufficiently tense to

[10]Over four decades ago Felix Frankfurter and Nathan Greene acknowledged this fact as one of the major practical difficulties in proceedings for injunctive relief in labor disputes: "The injunction cannot preserve the so-called status quo; the situation does not remain in equilibrium awaiting judgment upon full knowledge. The suspension of activities affects only the strikers; the employer resumes his efforts to defeat the strike, and resumes them free from the interdicted interferences. Moreover, the suspension of strike activities, even temporarily, may defeat the strike for practical purposes and foredoom its resumption, even if the injunction is later lifted. Choice is not between irreparable damage to one side and compensable damage to the other. The law's conundrum is which side should bear the risk of *unavoidable* irreparable damage. Improvident denial of the injunction may be irreparable to the complainant; improvident issue of the injunction may be irreparable to the defendant. For this situation the ordinary mechanics of the provisional injunction proceedings are plainly inadequate. Judicial error is too costly to either side of a labor dispute to permit perfunctory determination of the crucial issues; even in the first instance, it must be searching." (Frankfurter & Greene, The Labor Injunction (1930) p. 201.)

[11]We decide here only that notice and opportunity to be heard are required in cases in which substantial free speech interests are at stake. The First Amendment protection of access to labor camps and peaceful picketing is firmly established by the federal and state decisions discussed above.

[12]The procedure of section 527, of course, remains adequate in all other instances, i.e., when a party seeks a temporary restraining order which is outside the area of First Amendment freedoms and does not substantially affect rights defined in article I, section 2, of the California Constitution.

justify an immediate conference with the judge. If there is a request by the defendant or his counsel for a reasonable time in which to respond to the complaint and affidavits, the judge shall exercise his discretion to determine whether to grant such additional time, with due regard for all the factors involved, including the complexities of the complaint and affidavits, the severity of the injunctive restrictions sought, and the exigencies of the controversy.

We are neither unaware of, nor insensitive to, the possibilities of violence in labor disputes. If an applicant for injunctive relief who is threatened with violence is unable to notify the defendant or his counsel, his affidavit may attest to his reasonable and good faith effort to do so; in that event a trial court could properly proceed with an ex parte hearing and grant a temporary restraining order. Furthermore, during the time the applicant is attempting to give notice he is not without legal protection: the criminal laws of our state prohibit violence of the type complained of here, and law enforcement authorities are available to apply those statutes. There is no reason to believe that criminal sanctions are any less a deterrent to criminal conduct than mere civil restraint.

In short, as the *Carroll* court pointed out, there is no place within the area of basic freedoms guaranteed by the First Amendment or, we hold, by article I, section 2, of the California Constitution, for ex parte restraining orders unless a showing is made that it was not reasonably possible to notify opposing parties or their counsel and afford them an opportunity to be heard.

The alternative writ of prohibition, having served its purpose, is discharged, and the peremptory writ is denied.

Wright, C. J., Sullivan, J., and Tobriner, J., concurred.

**RICHARDSON, J.**—I concur in the judgment and in the majority's analysis to the extent they conclude that an ex parte order should not be employed to restrain picketing activities in connection with a labor dispute. I decline, however, to endorse the majority's sweeping extension of that principle to all situations affecting "substantial free speech interests" since the circumstances in a particular case might very well justify ex parte proceedings despite an arguably "substantial" effect upon "free speech interests." The trial courts are fully equipped to determine, in their sound discretion, whether or not an ex parte order should issue, and I would refrain from imposing broad, undefined limitations upon the exercise of that discretionary injunctive power.

I also decline to join the majority in its reliance upon state constitutional provisions which are substantially identical to the First Amendment to the United States Constitution. In my view, such reliance is totally unnecessary and could very well be construed as an attempt to forestall review of our action by the United States Supreme Court.

**CLARK, J.,** Concurring and Dissenting.—I concur that due process does not compel notice in every proceeding under Code of Civil Procedure section 527. (See *Chrysler Credit Corp.* v. *Waegele* (1972) 29 Cal.App.3d 681 [105 Cal.Rptr. 914].) I further concur with the majority's holding that prior to issuance of an ex parte temporary restraining order the applicant must demonstrate "reasonable effort in good faith to give notice, in either formal or informal fashion, to either the defendant or his counsel." (*Ante,* p. 913.) However, the opinion limits notice to cases affecting substantial First Amendment rights, declaring that unnoticed proceedings are constitutionally sufficient in all other instances. (*Ante,* p. 913.) Why the exclusivity?

The majority's notice requirement—if sound—should not be limited to only a small class of First Amendment cases. This court possesses inherent power to create rules of practice and procedure. (*People* v. *Jordan* (1864) 65 Cal. 644, 646 [4 P. 683]; see, e.g., *Greene* v. *Superior Court* (1951) 37 Cal.2d 307, 310-311 [231 P.2d 821].) The following considerations dictate that we expand the holding of the majority opinion.

Consistent with traditional notions of fair play toward an opposing party (*Whittlesey* v. *Bellah* (1955) 130 Cal.App.2d 182 [278 P.2d 511]), notice secures the opportunity to be heard, ensures due process (*Link* v. *Wabash Railroad Co.* (1962) 370 U.S. 626 [8 L.Ed.2d 734, 82 S.Ct. 1386]; *Crescendo Corp.* v. *Shelted, Inc.* (1968) 267 Cal.App.2d 209 [72 Cal.Rptr. 776]), and yet neither delays the proceeding nor impedes judicial relief. Indeed, at oral argument, the practice of informal notice was conceded to be common.

The opinion requires attempted notice in First Amendment cases based on concerns (1) that shortages of factual and legal contentions occur in ex parte proceedings, and (2) that difficulty results in properly framing the judicial relief when only one side is presented. But these concerns are not exclusive to First Amendment controversies, instead being applicable in one degree or another to all ex parte proceedings. Whether the dispute involves child custody, repossession, or picketing,

the judicial function is best fulfilled when competing views are communicated early in the controversy.

No justification exists for allowing unnoticed proceedings when informal notice could reasonably be given. The courts have consistently been critical of unnoticed proceedings. (See, e.g., *Lummus Company* v. *Commonwealth Oil Refining Company* (2d Cir. 1961) 297 F.2d 80, 83; *Pennsylvania Railroad Company* v. *Transport Workers Union* (3d Cir. 1960) 278 F.2d 693, 694; *Arvida Corporation* v. *Sugarman* (2d Cir. 1958) 259 F.2d 428, 429.) California courts have labelled notice the "better practice" (*Macmillan Petroleum Corp.* v. *Griffin* (1950) 99 Cal.App.2d 523, 526 [222 P.2d 69]), and have on occasion judicially mandated notice when notice has not been statutorily prescribed. (See, e.g., *Hicks* v. *Sanders* (1940) 40 Cal.App.2d 211, 215 [104 P.2d 549].) Finally, the United States Supreme Court has said, "[I]nformal notice and a hastily arranged hearing are to be preferred to no notice or hearing at all." (*Granny Goose Foods, Inc.* v. *Teamsters* (1974) 415 U.S. 423, 433-434, fn. 7 [39 L.Ed.2d 435, 447, 94 S.Ct. 1113].)

In past exercises of our procedure-making power, we often have looked to federal rules of practice for guidance. (See, e.g., *City of San Jose* v. *Superior Court* (1974) 12 Cal.3d 447, 453-454 [115 Cal.Rptr. 797, 525 P.2d 701]; *Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 821 [94 Cal.Rptr. 796, 484 P.2d 964].) Here examination reveals that under federal rules a requirement that reasonable effort be made to give notice is applied across the board. (See Fed. Rules Civ. Proc., rule 65(b).)[1] The principle underlying this broad requirement is made clear by the drafters of the rule: "In view of the possibly drastic consequences of a temporary restraining order, the opposition should be heard, if feasible, before the order is granted. Many judges have properly insisted that, when time does not permit of formal notice of the application to the adverse party, some expedient, such as telephonic notice to the attorney for the adverse party, be resorted to if this can reasonably be done. . . . [I]nformal notice, which may be communicated to the attorney rather than the adverse party, is to be preferred to no notice at all." (Adv. Committee's Note to 1966 Amendment to Rule 65(b), 39 F.R.D. 124-125.) This principle is equally applicable to state court proceedings, and this court should follow the federal lead.

---

[1] Rule 65(b) provides in pertinent part: "A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the

Adopting this general notice requirement, of course, does not mean that actual notice will be required in every instance. As indicated by the federal rule, situations occasionally arise involving circumstances of such exigency that even attempted notice would be unreasonable. While under the new rule the applicant would be required to establish the existence of these circumstances and the reasonableness of his effort to give notice, the court would then be free to act ex parte.

### INAPPLICABILITY OF THE MAJORITY'S RULE TO ITS OWN CASE

The inadvisability of restricting the new notice requirement is further seen in the difficulty in applying the rule to this case. To do so, of course, we must hold that "substantial free speech interests" were affected by the TRO. This the opinion does by concluding the order constituted a prior restraint on free speech by (1) limiting picketing and (2) impeding the picketers' access to the labor camp. In addition to rejecting any need to find substantial First Amendment interests prior to requiring notice, I dispute the suggestion the order here infringed such interests.

### A. *The Picketing Limitations Protected Rather Than Restricted Free Speech Interests*

The temporary restraining order issued by the trial court contained essentially five elements. It enjoined (1) trespassing on applicant's property, (2) obstructing ingress and egress to the property, and (3) inflicting or threatening physical injury or property damage. Further, the order (4) limited the number of pickets at the property and, (5) imposed minimum intervals at which they could be spaced.

Analysis reveals that not one of these five elements constitutes a prior restraint on conduct protected by the First Amendment. Instead, the effect of the TRO was to preserve and promote First Amendment freedom.

The law is well-settled that the First Amendment does not sanction picketing which includes *trespass on private property* (see, *infra*, pp. 908-912), *obstruction to ingress and egress* (*Lisse* v. *Local Union No. 31* (1935) 2 Cal.2d 312, 321 [41 P.2d 314]; *Chrisman* v. *Culinary Workers' Local* (1941) 46 Cal.App.2d 129, 133 [115 P.2d 553]), *violence* (*Drivers*

---

adverse party or his attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting his claim that notice should not be required. . . ."

*Union* v. *Meadowmoor Co.* (1941) 312 U.S. 287 [85 L.Ed. 836, 61 S.Ct. 552, 132 A.L.R. 1200]; *Steiner* v. *Long Beach Local No. 128* (1942) 19 Cal.2d 676, 682-683 [123 P.2d 20]), *or threat of violence (Steiner* v. *Long Beach Local No. 128, supra,* 19 Cal.2d 676, 682; *Pezold* v. *Amalgamated etc. Workmen* (1942) 54 Cal.App.2d 120, 123 [128 P.2d 611]). *Instead, all picketing will be enjoined completely when such improper conduct becomes intertwined with it.*

The first three elements of the order (prohibiting trespassing, violence, and obstructing access) avoid future need to terminate all picketing because the three enjoin the unlawful aspects before the otherwise protected activity becomes tainted. Therefore, it must be concluded the order effectively *protected* the organizers' First Amendment right, rather than restricted it.

The effect of the last two elements of the order (limiting the number and spacing of picketers) was also not to abridge First Amendment freedoms. First, these elements served not to restrain the expression of ideas but to give order to their expression. As made clear by the United States Supreme Court, regulation of the manner of expression—so long as not functionally prohibitory—does not constitute prior restraint. (*Southeastern Promotions, Ltd.* v. *Conrad* (1975) 420 U.S. 546 [43 L.Ed.2d 448, 95 S.Ct. 1239], citing *Cox* v. *New Hampshire* (1941) 312 U.S. 569, 574 [85 L.Ed. 1049, 1052-1053, 61 S.Ct. 762, 133 A.L.R. 1396]; *Poulos* v. *New Hampshire* (1953) 345 U.S. 395, 408 [97 L.Ed. 1105, 1115-1116, 73 S.Ct. 760, 30 A.L.R.2d 987].)

Second, like the first three components of the order, the last two essentially preserve the picketers' rights. Picketing ceases to be constitutionally protected where it coerces rather than informs. (*Steiner* v. *Long Beach Local No. 128, supra,* 19 Cal.2d 676, 682.) Hence, picketing may be enjoined when it becomes an intimidating mass demonstration. (*Auto Workers* v. *Wisconsin Board* (1956) 351 U.S. 266, 276 [100 L.Ed. 1162, 1173, 76 S.Ct. 794]; *People* v. *Spear* (1939) 32 Cal.App.2d 165, 168 [89 P.2d 445].) By establishing a ceiling on the total number of picketers present at one time and by limiting their ability to cluster—thereby maintaining the picketing within the shelter of the First Amendment—this order again *preserves* the United Farmworkers' ability to communicate its message. While these limitations may have properly reduced the intimidating effect of the message, it cannot be concluded they impeded the union's ability to communicate it in view of the small size of the grower's property.

B. *No Right of Access for Trespassing Picketers*

The opinion treats as a well-settled rule the conclusion there exists a First Amendment right in union organizers to go onto the farmer's private property to attempt unionizing the latter's employees. Such is not the case. Recent decisions of the United States Supreme Court and of this court make clear that with very limited exception the right of private property transcends the outsider's right of expression.

"Before an owner of private property can be subjected to the commands of the First and · Fourteenth Amendments the privately owned property must assume to some. significant degree the functional attributes of public property devoted to public use." (*Central Hardware Co.* v. *N.L.R.B.* (1972) 407 U.S. 539, 547 [33 L.Ed.2d 122, 128-129, 92 S.Ct. 2238].)[2] "Although accommodations between the values protected by these three Amendments [First, Fifth and Fourteenth] are sometimes necessary, and the courts properly have shown a special solicitude for the guarantees of the First Amendment, this court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only." (*Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551, 567-568 [33 L.Ed.2d 131, 141-142, 92 S.Ct. 2219].)

The rule in the series of cases beginning with *Marsh* v. *Alabama* (1946) 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276], and extending to *Lloyd Corp.* v. *Tanner, supra,* is that the right of private property, protected by the Fifth and Fourteenth Amendments, is subordinated to an unwelcome outsider's First Amendment right only in the limited situation where (1) the property has assumed "to some significant degree the functional attributes of public property devoted to public use," (2) the thought to be communicated relates directly to the property, *and* (3) no reasonable alternative means is available by which the thought can be communicated. (*Lloyd Corp.* v. *Tanner, supra,* 407 U.S. 551; *Central Hardware Co.* v. *N.L.R.B., supra,* 407 U.S. 539; *Food Employees* v. *Logan Plaza* (1968) 391 U.S. 308 [20 L.Ed.2d 603, 88 S.Ct. 1601]; *Marsh* v. *Alabama, supra,* 326 U.S. 501.) It is clear from the record that at least the first of these three requirements is not satisfied here; the orchard bears no attribute of

[2]A person may go onto the property of another for the sole purpose of ascertaining whether the latter would welcome the former's noncommercial message at that location. (*Martin* v. *Struthers* (1943) 319 U.S. 141 [87 L.Ed. 1313, 63 S.Ct. 862, 882].) However, once the outsider is aware he is unwelcome on the property, he has no right to remain. "A city can punish those who call at a home in defiance of the previously expressed will of the occupant . . . ." (*Id.,* at p. 148.)

public property. (See *Central Hardware Co.* v. *N.L.R.B., supra,* 407 U.S. 539; *In re Asociacion de Trabajadores Agricolas de Puerto Rico* (D.Del. 1974) 376 F.Supp. 357.) Thus, the right to private property is protected against intrusion by one asserting his right to speech.

In reaching the contrary conclusion, the majority's opinion avoids even reference to these high court decisions—and further, substantially disregards our recent decision in *Diamond* v. *Bland* (1974) 11 Cal.3d 331 [113 Cal,Rptr. 468, 521 P.2d 460]. Contrary to Justice Mosk's suggestion in his majority opinion, footnote 3 in *Diamond* v. *Bland* creates no labor picketing exception from the rule discussed above. In distinguishing the labor cases, *Diamond* pointed out that one element of the tripartite test, absent in *Diamond,* was present in those cases, namely, the speech was directed at the picketed property. The other two parts of the test were met in the labor cases, and there is nothing in footnote 3 or the text accompanying it indicating that labor cases are exempt from the tripartite test.[3] The truth of this conclusion is best reflected in Justice Mosk's own analysis of the cases in his *dissenting* opinion in *Diamond* v. *Bland*: "These decisions emphasized that an employee who sought to bring his grievance to the attention of the public and apply economic sanctions against his employer could effectively do so only at the place where the business was located, and that any incidental impairment of the shopping center owner's property rights was largely theoretical since he had opened his premises to the public and his right in the property was 'worn thin by public usage.' " (*Diamond* v. *Bland, supra,* 11 Cal.3d at p. 341 (Mosk, J., dissenting).) Clearly there is no suggestion in either *Diamond,* or the cases discussed in its footnote, that picketers may encroach private property assuming no public attribute.

In support of its contrary conclusion, the opinion relies on several decisions of the federal district courts. However, most are not in point, either involving private property resembling the company town situation

---

[3]The text in *Diamond* reads, "The Court distinguished *Logan* on the basis that, unlike the situation in that case, the handbilling had no relation to any purpose for which the shopping center was being used, [fn. 3] and that respondents had adequate alternative avenues to disseminate their views by distributing the material on the public streets and sidewalks, including those surrounding the shopping center." (*Id.,* at p. 334.) The footnote then states: "By a parity of reasoning, both *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union, supra,* 61 Cal.2d 766, and *In re Lane, supra,* 71 Cal.2d 872, are likewise distinguishable, since in both cases labor unions had a labor dispute with, and were picketing, businesses located within the shopping centers. The labor activity in those cases had a direct relation to the businesses affected by that activity, a factor which led us to strike the balance between private property rights and First Amendment activities in favor of the latter."

in *Marsh* v. *Alabama* or addressing the employer's ability to restrict his tenant-employee's right to invite people onto the property.[4] At best it can be said the cases relied on only reflect a conflict in authorities at the *trial court level*—with the most recent decision, based on the high court decisions discussed above, declaring a constitutional right of access does not exist. (See *In re Asociacion de Trabajadores Agricolas de Puerto Rico, supra,* 376 F.Supp. 357.) While the opinion expresses concern that the labor camp not become a prison, by allowing unwelcome picketers to corral the camp's occupants, the majority's holding may prove self-defeating.

McComb, J., concurred.

---

[4]We are not concerned in this case with the right of the resident workers to invite people onto the property. There is no evidence of any such invitation, nor have the union representatives suggested that during any of their trips to the camp prior to the TRO they were ever welcomed by any of the occupants to stay.