[Civ. No. 29662. Fourth Dist., Div. Two. July 21, 1983.]

WILLIAM DEWAYNE DORITY et al., Petitioners, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
DENNIS E. KOTTMEIER, as District Attorney, etc., et al., Real Parties
in Interest.

[Civ. No. 29664. Fourth Dist., Div. Two. July 21, 1983.]

KRISTOPHER DEWAYNE DORITY, a Minor, etc., Petitioner, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
WILLIAM ZIPRICK, Real Party in Interest.

**COUNSEL**

Murray & Ames, S. Donald Ames and Timothy L. Guhin for Petitioners.

No appearance for Respondent.

Lawson & Hartnell, Bryan C. Hartnell, Alan K. Marks, County Counsel, and Richard W. Strong, Deputy County Counsel, for Real Parties in Interest.

Irene L. Silverman, Richard Stanley Scott, Jay N. Hartz and William J. Winslade as Amici Curiae on behalf of Real Parties in Interest.

OPINION

RICKLES, J.—In this tragic case we are called upon to decide the propriety of judicial intervention regarding the termination of life support devices sustaining the bodily functions of a brain-dead minor.

Our courts are called upon to determine the rights and fate of persons in many situations and this may be one area in which we ought not to be involved. We are mindful of the moral and religious implications inherently arising when the right to continued life is at issue. Considering the difficulty of anticipating the factual circumstances under which a decision to remove life-support devices may be made, to say courts lack the authority to make such a determination may also be unwise.

## FACTS

On November 16 a 19-day-old infant was admitted to the emergency room of a local hospital and later transferred to Loma Linda University Medical Center. The infant's parents brought him in after they noticed an odd twitching activity of the left arm which the doctors interpreted as a seizure disorder. The attending physicians performed a variety of tests, the results of which showed increased intracranial pressure. The prescribed treatment called for decreasing the amount of carbon dioxide in the blood which is done by increasing respirations. Because the infant was already having irregular and shallow respirations, the doctors placed him on a respirator, i.e., the life-support device.

The baby's condition deteriorated significantly. At week's end he failed to respond to any stimulation. The doctors ordered electroencephalograms and a cerebral blood flow to determine the viability of the brain. These tests, performed on or about November 22 and then about one month later, showed electrocerebral silence, which means little, if any, electrical activity in the brain. The doctors concluded the infant, having shown no signs of purposeful spontaneous activity or spontaneous respirations, was brain dead.[1]

As a result of this diagnosis the doctor recommended removing the life-support device. The baby's heart was expected to stop within 10 minutes after removal. This hospital's policy in similar circumstances has been to defer to the parent's wishes concerning the removal of life-support devices in light of the emotional implications of such a decision. One doctor testified

---

[1]The Loma Linda hospital defines brain death as total and irreversible cessation of brain function, although there is no written policy as to how to make that diagnosis.

the hospital has kept several children on these devices for prolonged periods of time "until the parents were emotionally able to realize what the medical opinion was and what its final impact was."

The doctors anticipated the bodily functions could be maintained only for a few weeks. However, the baby's heart continued to pump and the lower court was petitioned to appoint a guardian (see Prob. Code, § 2100 et seq.) in order to secure consent of a responsible person to terminate the life-support device. The hearing was held on January 17 and 21. The court ordered both parents present. The court was informed the parents had been fully advised of their child's condition. After first consulting with counsel, the parents spoke privately and thereafter chose to withhold consent to the withdrawal of the life-support device.[2]

The trial court appointed the Director of the Department of Public Social Services as temporary guardian of the person of the minor child. After hearing unrefuted medical testimony concluding the infant was brain dead, the court directed "the Temporary Guardian give the appropriate consent to the health care provider to withdraw the life support system presently used to maintain the vitality of the minor child."

The parents and counsel for the minor child petitioned this court for a writ of prohibition against removing the life-support device.

Before this court could act on these petitions, the infant's bodily functions ceased and the life-support device was removed.

## MOOTNESS

■ In light of the important questions raised by this case, this court has the discretion to render an opinion where the issues are of continuing public interest and are likely to recur in other cases. (*Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 141 [137 Cal.Rptr. 14, 560 P.2d 1193]; *United Farm Workers of America* v. *Superior Court* (1975) 14 Cal.3d 902, 906-907 [122 Cal.Rptr. 877, 537 P.2d 1237].) The novel medical, legal and ethical issues presented in this case are no doubt capable of repetition and therefore should not be ignored by relying on the mootness doctrine. This requires us to set forth a framework in which both the medical and legal professions can deal with similar situations.

---

[2] On November 23, both parents were arrested and charged with felony child neglect or child abuse. The parents remained in custody and were held to answer to these charges.

## The Merits

Recent medical and technological advancements and procedures have enabled physicians to prolong biological functions even after the brain ceases to function. The immediate question arises as to whether and under what circumstances these procedures ought to be employed or continued. Many times prolonging this biological existence with life-support devices only prolongs suffering, adding economical and emotional burden to all concerned. Conversely, a decision to withdraw these devices which would eventually result in the cessation of all bodily functions even though no life is left may cause equal emotional trauma.

Health and Safety Code section 7180, subdivision (a), provides: "An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards." Faced with this definition and the advanced medical technology, we must deal with the procedural problems resulting when bodily functions are maintained after brain death.

In California the right to make that decision, i.e., to withdraw life-support devices, has been established by the Legislature. Health and Safety Code section 7185 et seq., the Natural Death Act, acknowledges in adults the fundamental right to control decisions relating to the rendering of their own medical care. More specifically, section 7186 "recognize[s] the right of an adult person to make a written directive instructing his physician to withhold or withdraw life-sustaining procedures in the event of a terminal condition."

Other jurisdictions acknowledge the right to withdraw life-support devices under the constitutional right of privacy in the penumbra of specific guarantees of the Bill of Rights. (See *Matter of Quinlan* (1976) 70 N.J. 10 [355 A.2d 647, 79 A.L.R.3d 205]; *Superintendent of Belchertown* v. *Saikewicz* (1977) 373 Mass. 728 [370 N.E.2d 417]; *Severns* v. *Wilmington Medical Center, Inc.* (1980 Del. Supreme Ct.) 421 A.2d 1334.) In *Saikewicz* the court stated "[t]he constitutional right to privacy . . . is an expression of the sanctity of individual free choice and self-determination as fundamental constituents of life. The value of life as so perceived is lessened not by a decision to refuse treatment, but by the failure to allow a competent human being the right of choice." (370 N.E.2d at p. 426.)

These cases then take one step further by allowing a guardian of a comatose patient *who has not been declared brain dead* to vicariously assert the patient's constitutional right to refuse medical treatment, i.e., to with-

draw life-support devices. There is a distinction, however, between these cases and the case at issue—the declaration of brain death. In *Quinlan* v. *Severns* the patients were in a comatose, noncognitive state, being maintained on life-support systems. In *Saikewicz* the ward was severely mentally retarded and unable to understand or consent to painful chemotherapy treatment which might prolong his life but would not necessarily cure his disease. In each case the court allowed the guardian to refuse treatment, including the removal of life-support devices, for these individuals who were not brain dead. These cases, although dealing with patients who were not yet brain dead, nevertheless can provide some guidance in this case. If removal of life-support devices can be proper as to persons who are still in some sense alive, then a fortiori appropriate procedures may be devised for removal of such devices from persons who are brain dead.

■■■ In the case before us, we have a petition to appoint a guardian after the doctors have made their brain death determination.[3] A portion of the hearing was devoted to medical testimony which resulted in the court's declaring the infant brain dead. We find no authority mandating that a court must make a determination brain death has occurred. Section 7180 requires only that the determination be made in accordance with accepted medical standards. As a safety valve, Health and Safety Code section 7181 calls for independent confirmation of brain death by a second physician. This is, and should be, a medical problem and we find it completely unnecessary to require a judicial "rubber stamp" on this medical determination. This does not mean parents or guardians are foreclosed from seeking another medical opinion. In this case, both the treating and consulting physicians agreed brain death had occurred. No medical evidence was introduced to prove otherwise. The medical profession need not go into court every time it declares brain death where the diagnostic test results are irrefutable.

Next the trial court granted the petition to appoint a guardian under Probate Code section 2100 et seq. Section 2250 provides that a temporary guardian may be appointed for good cause or other showing.

The state has a substantial interest in protecting and providing for the child's care when the parents represent a potential threat to the child's well-being or where the parents for some reason become unavailable. Investigations revealed the parents in this case may have been responsible for the child's injuries. The parents had been held to answer on charges of child

---

[3]We suggest where child abuse results in severe injuries, quick and decisive action is necessary. This may include removal of the child from parental control and decisions involving the further medical care of the child, including the removal of life-support systems. Welfare and Institutions Code section 300 et seq. would seem to provide a more appropriate vehicle for expeditiously resolving these problems.

neglect and child abuse. Parents, by their own action, can become legally unavailable and unable to provide the proper care for their child.

If the parents in this case had injured the minor child less severely, a guardianship appointment would have been appropriate. It would be anomalous to hold that a guardianship is proper when the parents hurt the child to some extent, but not when they injure the child so badly it is or may be brain dead. Such conduct should be greater, not less, reason to appoint a guardian. There was plenty of evidence here to support a judicial determination the parents' conduct was detrimental to the welfare of the child. Where important decisions remain to be made about the child, and where the parents have demonstrated an inability to act in the best interest of the child, it is proper to appoint a guardian to make the necessary decisions.

Once the guardian is appointed in a case where a child is or may be brain dead, what power does the guardian have? Subject to the court's control, a temporary guardian has the same authority as a parent having legal custody of the child. The initial decision the substitute parent must make when faced with a medical diagnosis of brain death is whether there is any reason or basis to contest the diagnosis. Investigation by the guardian may reveal objective symptoms inconsistent with brain death, or a second medical opinion may cast doubt on the diagnosis, requiring the court to determine if brain death has occurred. The unique case at bench provides another occasion where court intervention is necessary. Here, the guardian was faced with a sharp conflict between the unavailable parents, the attorney appointed to represent the minor's interests, and the health care providers as to whether brain death had occurred. Common sense would indicate the guardian was in need of guidance. In order to appropriately advise the guardian, the trial court can properly hear the testimony and decide whether the determination of brain death was in accord with accepted medical standards. Here the court so found. Its finding was supported by substantial evidence.

■ It appears that once brain death has been determined, by medical diagnosis under Health and Safety Code section 7180 or by judicial determination, no criminal or civil liability will result from disconnecting the life-support devices (see *People* v. *Mitchell* (1982) 132 Cal.App.3d 389 [183 Cal.Rptr. 166]). This does not mean the hospital or the doctors are given the green light to disconnect a life-support device from a brain-dead individual without consultation with the parent or guardian. Parents do not lose all control once their child is determined brain dead. We recognize the parent should have and is accorded the right to be fully informed of the child's condition and the right to participate in a decision of removing the life-support devices. This participation should pave the way and permit discontinuation of artificial means of life support in circumstances where even

those most morally and emotionally committed to the preservation of life will not be offended. Whether we tie this right of consultation to an inherent parental right, the Constitution, logic, or decency, the treating hospital and physicians should allow the parents to participate in this decision.

No judicial action is necessary where the health care provider and the party having standing to represent the person allegedly declared to be brain dead are in accord brain death has occurred. The jurisdiction of the court can be invoked upon a sufficient showing that it is reasonably probable that a mistake has been made in the diagnosis of brain death or where the diagnosis was not made in accord with accepted medical standards. We are in accord with the Loma Linda University Medical Center policy of deferring to parental wishes until the initial shock of the diagnosis dissipates; and would encourage other health care providers to adopt a similar policy.

In the case at bar the parents became unavailable by their actions, requiring the court to appoint a temporary guardian. The guardian, faced with a diagnosis of brain death, correctly sought guidance from the court. The court, after hearing the medical evidence and taking into consideration the rights of all the parties involved, found Kristopher DeWayne Dority was dead in accordance with the California statutes and ordered withdrawal of the life-support device. The court's order was proper and appropriate.[4]

Accordingly, the writs are denied.

Morris, P. J., and Kaufman, J., concurred.

A petition for a rehearing was denied August 11, 1983, and the petition of Kristopher DeWayne Dority for a hearing by the Supreme Court was denied October 27, 1983. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

[4]The court is aware of a recent Attorney General opinion (65 Ops.Cal.Atty.Gen. 417 (July 2, 1982) CV 81-508) reaching a different resolution than that reached today. We have examined the opinion and are not persuaded by its logic.