McKUSICK, Chief Justice.
In this action founded on both common law fraud principles and the Used Car Information Act (the UCIA), 10 M.R.S.A. §§ 1471-1477 (1980 & Supp. 1984-1985), the buyer of a second-hand Cadillac seeks to recover for the sellers’ failure to disclose to him known damage to the car from its earlier submersion in salt water. After a jury trial, the Superior Court (York County) entered judgment for the buyer for compensatory damages in the amount of $4,500 and punitive damages of $2,500, and awarded attorney’s fees under the UCIA[1] of $2,520. On their appeal, the sellers make only two arguments: (1) that they were not “dealers” within the provisions of the UCIA and so there is no authority for the Superior Court’s award of attorney’s fees and (2) that this court should declare as the law of the state of -Maine that punitive damages may no longer be awarded except where they are explicitly authorized by statute. We reject both arguments.
Defendant Richard Petrin is president of, and does business through, defendant Seacoast Tractor Sales, Inc., of Scarborough. Petrin was the only agent of Seacoast with whom Raymond Tanguay dealt during the events that gave rise to this lawsuit. Seacoast’s primary business is the retail sale of tractors and farm equipment. In July of 1979, Seacoast purchased a 1977 Cadillac Seville for the use of Petrin from Copp Motors for $6,500. No sales tax was paid; Petrin gave Copp Seaeoast’s sales tax exemption number.[2] Copp provided Petrin with a disclosure statement stating that: “the odometer has been repaired, replaced and serviced”; “running gear has more mileage than car shows, running gear replaced”; “the seller knows this automobile to have been saltwater damaged submerged.”
After Seacoast had' owned the car for several months, Tanguay learned that the auto was for sale. Tanguay visited Sea *1350 coast and inquired about the Cadillac. In their trial testimony, the parties disagreed about what was said at their meeting concerning the history of the car. Petrin testified that, well before the sale, he told Tan-guay that the Cadillac had been submerged in salt water. Tanguay specifically denied being told of the submersion; on the contrary, he testified that Petrin blamed the stains on the seats (in fact caused by salt water) upon discoloration by the sun. Tan-guay also testified that Petrin made several statements concerning the car’s good working order. During that visit Tanguay road-tested the Cadillac using Seacoast’s “dealer plates.” The parties agreed to a price of $7,500, which included a sum paid and collected as sales tax. Petrin transferred the title to Tanguay on December 12, 1979. Petrin filed the certificate of title application with the Secretary of State, filling out the form as if Seacoast was a car dealer. During the weeks before registration of the car was complete, Tanguay drove the Cadillac with two successive sets of 10-day temporary plates provided by Petrin.
Within two weeks, the car developed the first of what became an unending series of problems for its new owner. Initially, the starter broke. Later, several electrical switches malfunctioned, and all these parts were found to be corroded, showing damage consistent with a vehicle that had been submerged in salt water. Petrin repaired the initial problems at no cost. Later still, the car developed further malfunction in its electrical system. Tanguay testified that he had to have additional repairs done on the car, at a total cost of $2,000.
I. Attorney’s fees under the Used Car Information Act
The Used Car Information Act prohibits any “dealer” from selling a used motor vehicle unless he furnishes to the buyer a written statement containing certain information, including:
A statement identifying the type of damage, if any, that the vehicle has sustained, such as fire, water or substantial collision damage, if that information is known to the dealer.
10 M.R.S.A. § 1475(2)(D). The UCIA gives an aggrieved buyer a private remedy, including liquidated damages up to $1,000 and, what is critically significant to the case at bar, the award of attorney’s fees. Id., § 1477(3). Defendant-sellers’ only argument against the imposition of attorney’s fees here is that, in selling the used Cadillac to Tanguay, they were not “engaged in the business of selling, offering for sale, or negotiating the sale of used motor vehicles” and so were not “dealers” under the UCIA.[3]
Specifically, the sellers contend that the definition of “dealer” for purposes of the UCIA is, or should be, the same as the definition of a “dealer” who is required to be licensed under title 29. Under title 29, a person must have a license if he “buys ... [for] resale, sells or offers to negotiate the sale of more than 5 motor vehicles in any 12-month period, or displays ... 3 or more motor vehicles for sale at any one time or within any 30-day period upon premises owned or controlled by him_” 29 M.R. S.A. § 342 (Supp.1984-1985). We reject the sellers’ attempt to incorporate the numerical test of the title 29 dealer’s licensing law into the UCIA.
In the first place, a different standard of interpretation is in order when we construe the definition of “dealer” in the *1351 UCIA in title 10 than when we construe the same word in the context of the dealers’ licensing law in title 29. The UCIA is a civil consumer-protection act,[4] while the dealers’ licensing law is a regulatory statute enforced by criminal sanctions.[5] The UCIA will be interpreted liberally to carry out the legislature’s beneficent purpose of protecting purchasers of used cars. See Eastern of Maine, Inc. v. Vintners Group Ltd., 455 A.2d 936, 941 (Me.1983) (statutes should be interpreted so as to achieve the purpose intended by the legislature); Schwanda v. Bonney, 418 A.2d 163, 165-66 (Me.1980) (courts should implement legislative policy as well as legislative intent). On the other hand, the dealers’ licensing law, being enforced by criminal sanctions of up to $500 as a fine and 6 months in jail for an individual and up to $5,000 for a corporation,[6] must be strictly construed. See State v. Goyette, 407 A.2d 1104, 1110 (Me.1979); State v. Millett, 392 A.2d 521, 525 (Me.1978).
In the second place, analysis of the definition section of the UCIA (section 1471) precludes the inference that the legislature intended that the title 29 numerical test should be imported into title 10’s definition of “dealer.” Section 1471 of the UCIA states that, “As used in this chapter, unless the context otherwise indicates, the following words shall have the following meanings.” Subsection 2 of that section then gives a definition of “dealer” using general language, and never resorts to any numerical test, as does title 29, for determining when one is engaged in the business of selling autos. The UCIA in defining “dealer” conspicuously omits any reference to title 29 or any other outside source of meaning. Importantly, whenever the legislature wanted the section 1471 definitions to be read in conjunction with other statutes, it said as much. For example, the definition of “motor vehicle” in the UCIA, 10 M.R.S.A. § 1471(4), does make reference to 29 M.R.S.A. § 1652. Similarly, the UCIA definition of “warranty,” 10 M.R. S.A. § 1471(8), refers to article 2 of the Uniform Commercial Code, 11 M.R.S.A. § 2-101 et seq. (1976). If the legislature had intended that the definition of “dealer” in section 1471(2) be limited by the numerical test of 29 M.R.S.A. §§ 341-342, it could readily have provided a cross-reference as it did for some other UCIA definitions.
Under the definition of “dealer” as set forth in the UCIA, the jury had to determine if Petrin and Seacoast were “engaged in the business of selling used motor vehicles” at the time they sold the used Cadillac to Tanguay. The determination whether one is engaged in a business requires analysis of two factors: first, the number and continuous nature of the transactions, see United States v. Tarr, 589 F.2d 55, 59 (1st Cir.1978); and second, the circumstances surrounding the particular transaction in question, see Supreme Malt Products Co. v. United States, 153 F.2d 5, 6-7 (1st Cir.1946). Based on the partial transcript of the trial testimony that the appellant-sellers have provided this court, the actions of Petrin, on behalf of both himself and his corporation, fully justify the jury’s finding that defendants were engaged in the business of selling used cars.
*1352 The sale of the Cadillac to Tanguay was not the first time that Seacoast had purchased a car for the use of one of its employees and later resold that used vehicle. In addition, the equipment dealership had taken automobiles and pickup trucks in trade and had later offered them for public sale. By Petrin’s own admission, at least a dozen vehicles, albeit over a 20-year period, had been acquired by his equipment dealership and later resold.
More importantly, the actions taken by defendants were such that the jury could have reasonably found that Seacoast viewed itself to be acting as a dealer in the Tanguay transaction, and held itself out to be such. Petrin paid no sales tax to Copp but did collect tax on the sale to Tanguay. Petrin attached Seacoast’s dealer equipment plates to the Cadillac so that Tanguay could test-drive the vehicle. He used Seacoast’s equipment dealer number when filling out the application for registration. And, Petrin issued two sets of temporary plates for use on the Cadillac.
Seacoast was a registered equipment dealer, 29 M.R.S.A. §§ 341-342 (1978 & Supp. 1984-1985). As such it was relatively easier for the jury to conclude that Seacoast was also engaging in the business of selling used cars than it would have been if Seacoast had been completely uninvolved in the sale of vehicles. For example, an appliance dealer who resells a company ear does not have the ability to use dealer plates for test rides, or to supply the Secretary of State with “dealer numbers,” or to issue temporary plates. From the fact that Pet-rin used the trappings of Seacoast’s equipment dealership in the course of making the sale of the Cadillac to Tanguay, a jury could reasonably find that defendants fell within the UCIA’s definition of a dealer.
In sum, the sellers on their appeal have shown no error in the Superior Court’s order that they pay plaintiff Tanguay’s attorney’s fees.
II. Punitive Damages
In their appeal defendants make a frontal attack on the common law doctrine of punitive damages, urging its complete abandonment. We reject that invitation. Nonetheless, we must review the Superior Court’s award of punitive damages in light of our recent decision in Tuttle v. Raymond, 494 A.2d 1353 (Me.1985), where we made a comprehensive reexamination of the Maine law of punitive damages. In Tuttle, we narrowed Maine law so that punitive damages are available only if the evidence is clear and convincing that the tortfeasor acted with malice. We also decided that the new rule on punitive damages should apply to any case that had not been terminated in final manner at the time the Tuttle opinion was issued. Id. at 1363. Even though the new rule is here applicable, defendants in the case at bar fail to show any error in the Superior Court’s award to plaintiff Tanguay of $2,500 in punitive damages. ..
Defendants have not brought to this court a transcript of either the jury instructions or the full testimony. As the appellants who have the responsibility for bringing up on their appeal “a transcript of such parts of the proceedings ... as [they deem] necessary,” M.R.Civ.P. 74(b)(1), defendants Petrin and Seacoast are bound by the limitations of the appellate record now before us. That record leaves us with no way of knowing what the jury was told it must find as a factual predicate for the award of punitive damages. We therefore must conclude that the jury, in returning a special verdict awarding punitive damages to Tan-guay, found to be proved every relevant allegation of Tanguay’s complaint. Thus, we must take as proven, that, as alleged in count II of that complaint, the acts of Pet-rin on behalf of Seacoast “were intentional, deliberate and willful, done with malice ... for the purpose of fraudulently inducing [Tanguay] to purchase [the used Cadillac].” (Emphasis added) Nothing in the present incomplete record suggests that the jury findings were not amply supported by the evidence; and, indeed, defendants make no such argument. Neither do they *1353 question in any way that the punitive damages award of $2,500 was reasonable in amount.
Moreover, defendants cannot benefit from our ruling in Tuttle v. Raymond that the malice necessary to support the award of punitive damages must be proved by clear and convincing evidence. Initially, given the absence of the jury instruction from the record, there is no indication in the materials defendants have submitted to this court that the jury did not find malicious behavior was proven in accordance with the standard announced in Tuttle. In any event, the record on appeal fails to show any objection by defendants in the Superior Court to the standard of proof that the jury was instructed to use in determining if punitive damages were appropriate. Accordingly, even if we assume that the presiding justice charged the jury on a preponderance of the evidence standard for punitive damages, defendants have not preserved for appeal any objection to that instruction. See Graybar Electric Co., Inc. v. Sawyer, 485 A.2d 1384, 1388 (Me.1985). Moreover, we will not as a general matter consider issues that have neither been briefed nor raised at oral argument before this court. See Harrington v. Town of Garland, 381 A.2d 639, 642 (Me.1978).
The entry is:
Judgment affirmed.
All concurring.

. 10 M.R.S.A. § 1477(3) (Supp.1984-1985) provides in pertinent part:
In addition to any other remedy, if a dealer violates this chapter, he is liable to the purchaser in an amount determined by the court of not less than $100 nor more than $1,000 as liquidated damages, and for costs and reasonable attorney’s fees.
(Emphasis added)

. Under 36 M.R.S.A. § 1764 (1978) all sales of motor vehicles are subject to sales tax except those purchased for resale or in other circumstances not applicable here.

. The definitions section of UCIA, 10 M.R.S.A. § 1471 (1980), provides in pertinent part:
As used in this chapter, unless the context otherwise indicates, the following words shall have the following meanings.

2. Dealer. “Dealer” means and includes a natural person, firm, corporation, partnership and any other legal entity that is engaged in the business of selling, offering for sale, or negotiating the sale of used motor vehicles, except auctioneers licensed by the Secretary of State and includes the officers, agents and employees thereof.
(Emphasis added)

.The UCIA, 10 M.R.S.A. § 1477 (1980 & Supp. 1984-1985), provides in pertinent part:
1. Any violation of this chapter shall constitute a violation of Title 5, chapter 10, Unfair Trade Practices Act. [5 M.R.S.A. §§ 212, 213 (1979 & Supp.1984-1985) provide only civil penalties and private remedies.]
2. Each violation of this chapter constitutes a civil violation and shall be punished by a forfeiture of not less than $100 nor more than $1,000....
3.[For text, see n. 1 above]

. The dealer’s licensing law, 29 M.R.S.A. § 342 (Supp.1984-1985), provides in pertinent part:
Failure to obtain a license or to comply with provisions of sections 347 or 348-A is a Class E crime.

. See 17-A M.R.S.A. §§ 1252(2), 1301 (1983).