STATE of Maine

v.

Austin J. DeCOSTER, d/b/a
DeCoster Egg Farms.

Supreme Judicial Court of Maine.

Argued Oct. 4, 1994.
Decided Jan. 23, 1995.

Stephen L. Wessler (orally), Thomas A. Harnett, Asst. Attys. Gen., Augusta, for plaintiff.

George F. Burns, Arnold C. Macdonald, Amerling & Burns, Hugh Calkins, Calkins & Pouravelis, Portland, Janice Morgan, Linda Christ, Pine Tree Legal Assistance, Inc., Augusta, Eric Nelson, Pine Tree Legal Assistance, Inc., Farmworker Unit, Bangor, for amici curiae.

Michael T. Healy (orally), William C. Knowles, Verrill & Dana, Portland, for defendant.

Before WATHEN, C.J., and GLASSMAN, CLIFFORD, RUDMAN and LIPEZ, JJ.

RUDMAN, Justice.

Austin J. DeCoster, d/b/a DeCoster Egg Farms ("DeCoster") appeals from a judgment of the Superior Court (Androscoggin County, *Bradford, J.*) permanently enjoining conduct that was found to violate the Maine Civil Rights Act, 5 M.R.S.A. § 4681 (Supp. 1991) ("Civil Rights Act") and ordering him to pay the costs and reasonable attorney fees of the plaintiff, the State of Maine. DeCoster contends that the Superior Court erred in finding a violation of the Civil Rights Act and, in the alternative, that the court erred in finding him liable for the civil rights violations committed by his nonparty supervisory employees ("supervisors"). DeCoster further asserts that the injunction issued by the Superior Court is too broad and consequently represents an abuse of discretion.

The State cross-appeals from the Superior Court's determination that DeCoster's actions are not violations of the Unfair Trade Practices Act, 5 M.R.S.A. §§ 207–214 (1989) ("UTPA"). The State contends that the court erred in finding that the UTPA is not applicable to the relationship between DeCoster and his resident employees. We disagree and hold that the relationship between DeCoster and his resident employees is not "trade or commerce" within the meaning of the UTPA. Accordingly, we affirm the judgment of the Superior Court in its entirety.

The court heard five days of testimony from 22 witnesses. The facts as found by the Superior Court may be briefly summarized as follows: DeCoster is the sole proprietor of egg farms employing about 300 workers, 100 of whom are of Hispanic ancestry who speak Spanish as their primary language. DeCoster was charged with engaging in a pattern or practice of conduct that prevented the workers and their families, living in housing furnished by him, from having contact with or access to a variety of service providers, friends, and family members in violation of the UTPA and the Civil Rights Act. Many of the workers live in a mobile home park maintained by DeCoster; they do not pay rent, heat, fuel or electricity. The mobile home park consists of approximately twenty mobile homes, houses only employees and their families, and when employment is terminated the employees must vacate the mobile homes.

DeCoster's employees have experienced difficulty adjusting to their new surroundings, primarily because of their inability to speak English. Since 1987 various organizations and individuals have come to the mobile home park to offer assistance. The Rural Community Action Ministry ("RCAM") workers offer family planning assistance, emergency housing and outreach services to clients who cannot get from their homes to

RCAM's offices. Pine Tree Legal Assistance ("Pine Tree") attorneys assist workers in a variety of legal matters, some of which have resulted in legal claims and actions against DeCoster. DeCoster resented the presence of the RCAM and Pine Tree personnel and, in August 1989, erected a sign stating:

NO ADMITTANCE

AUTHORIZED EMPLOYEES

ONLY

OTHERS REPORT TO OFFICE

A.J. DECOSTER CO.

Testimony of DeCoster's supervisors established that one of the reasons for the sign was to prevent RCAM and Pine Tree workers' access to DeCoster's employees. After the erection of the sign, DeCoster's supervisors threatened, intimidated and harassed RCAM workers. Three supervisors frequently followed the cars of visiting RCAM workers at dangerously close range and, on one occasion, blocked a RCAM worker's exit from the facility, allowing her to leave only after the police arrived and informed the supervisors that they would be arrested if they did not release her. A DeCoster supervisor also threatened a RCAM worker telling her, "[I]f you come back [to the trailer park], we will take you out." Consequently, both RCAM and Pine Tree discontinued their outreach services to DeCoster's employees.

The conduct of DeCoster's supervisors placed the RCAM outreach workers and residents of the mobile home park in fear for their personal safety, and interfered with the residents' access to social and legal services and their quiet use and enjoyment of their homes. The supervisors acted under the direction and control of DeCoster, with his knowledge and consent. The "No Admittance" sign was erected for the purpose of isolating the residents and denying their access to services that might cause financial or legal problems for DeCoster, and the sign discouraged legitimate visitors from entering the mobile home park.

### I. The Civil Rights Act

■ DeCoster first argues that the court erred in finding a violation of the Civil Rights Act. The court held that the employees living in DeCoster's mobile home park are tenants under Maine law and have a right to quiet enjoyment, including a right to receive visitors at their homes. DeCoster asserts that the employees occupy the mobile homes incident to their employment and, consequently, have no right to receive visitors.[1]

■ The Superior Court's conclusions that the laborers residing in DeCoster's mobile home park have a right to quiet enjoyment, including the right to receive visitors, is a conclusion of law, reviewable for error. *See Morin Bldg. Prod. Co. v. Atlantic Design & Constr. Co.*, 615 A.2d 239, 241 (Me.1992). An employee who occupies housing provided by an employer that is merely incidental to employment has been characterized as a "tenant incident to employment." *Moreno v. Stahmann Farms, Inc.*, 693 F.2d 106, 107 (10th Cir.1982). DeCoster relies on numerous cases from other jurisdictions holding that such employees have no right to possession of the property they occupy other than that which emanates from the contract of employment, and urges this Court to read these cases to support his contention that the laborers living in his mobile home park have no right to receive visitors. We decline DeCoster's invitation. The right of a laborer living in housing provided by the employer to receive visitors at home is inherently different from the right at issue in each of the cited cases—namely the right of an employer to evict an employee living in employer provided housing upon termination of employ-

---

1. DeCoster also asserts, relying on *Patten v. Bartlett*, 111 Me. 409, 89 A. 375 (1914), that even if this Court finds that the workers are tenants, they still do not have the right to receive visitors. This assertion is without merit. *Patten* merely holds that a tradesman delivering wood to a tenant at will was on the premises by implied invitation and does not address the rights of tenants to have visitors. *Id.* at 413, 89 A. 375. DeCoster also points out that a tenant's right to control access to the premises has not been expressly established by statute, and concludes that they have no such right. The right of a tenant to have visitors in their homes at reasonable times and for reasonable purposes, however, is so fundamental it requires no statutory authority.

ment. The fact that housing is furnished incident to employment has no bearing on whether a tenancy exists and the classification of employees as tenants incident to employment is irrelevant to the determination of whether those employees have a right to receive visitors in their employer provided residences.[2]

■ The question of whether laborers residing in employer provided housing are tenants under Maine law is one of first impression. DeCoster has voluntarily elected to furnish housing to his employees as an aid to his business. While it is true that the employees pay no monetary rent, the offer of free rent helped to induce some of these employees to leave their homes in Texas and Mexico and come to Maine to work for De-Coster. It is commonly understood that a portion of workers' compensation is housing and the same holds true under these facts. DeCoster benefits from this arrangement through the wages he is able to pay his workers and by having the workers on the premises immediately available for work. We conclude that this is sufficient consideration to find that DeCoster's employees are tenants under Maine law and as such have a right to quiet enjoyment, which includes a right to receive visitors in their homes.

Other jurisdictions have held that migrant workers living in employer provided housing have a right to receive visitors under theories of constitutional and property law.[3] Having determined that DeCoster's employees are tenants under Maine law with a right to receive visitors in their homes, we have no reason to go further and consider the constitutional issue of freedom of association or the question whether any property owner has the right to bar access to governmental services available to migrant workers.

DeCoster argues that because his employees receive the same compensation whether or not they live in the employer provided housing, the housing cannot be considered compensation.[4] The fact that some employees choose not to live in DeCoster's mobile homes does not negate the fact that the housing serves as an incentive and is part of the employees' compensation.

■ DeCoster argues that he cannot be found liable under the Civil Rights Act even if those acting under his direction and control intentionally used and threatened force and violence to interfere with the rights of his employees. The Superior Court's finding that the conduct of DeCoster's supervisors was carried out with the knowledge, consent and direction of DeCoster, is a finding of fact that we review for clear error. Findings of fact will be upheld if they are based on a justifiable inference drawn from credible evidence. *See Burton v. Merrill,* 612 A.2d 862, 865 (Me.1992). The court reasonably inferred from the evidence set forth above that

---

2. Under Maine law, whether a tenancy is incident to employment is not even relevant to the post employment eviction issue which is at the heart of the vast majority of "tenant incident to employment" cases from other jurisdictions. The rights of the parties in a post employment eviction dispute are governed by the following statutory provision: "Process of forcible entry and detainer may be maintained ... against a tenant where the occupancy of the premises is incidental to the employment of a tenant." 14 M.R.S.A. § 6001(1). Historically the characterization was also relevant in premises liability actions. However, under current precedents no different duty is owed to a tenant incident to employment because a landowner owes the same "duty of reasonable care in all circumstances to those lawfully on the land." *Poulin v. Colby College,* 402 A.2d 846, 851 (Me.1979).

3. *Folgueras v. Hassle,* 331 F.Supp. 615 (W.D.Mich.1971) contains a useful analysis of the constitutional rights of both the migrant workers

and the service providers seeking access, as well as the limitations on the property rights of the landowner. *See also Petersen v. Talisman Sugar Corp.,* 478 F.2d 73 (5th Cir.1973); *United Farm Workers of America v. Superior Court of Santa Cruz County,* 14 Cal.3d 902, 122 Cal.Rptr. 877, 537 P.2d 1237 (1975). In *State v. Shack,* 58 N.J. 297, 277 A.2d 369, 371-72 (1971), the New Jersey Supreme Court held that "under our State law the ownership of real property docs not include the right to bar access to governmental services available to migrant workers."

4. DeCoster points to *De Bruyn v. Romero,* 202 Mich.App. 92, 508 N.W.2d 150, 155 (1993), as support for his claim that where the same wages are paid to workers regardless of whether they live in company housing, the workers are not tenants under landlord tenant law. *De Bruyn,* however, involves eviction not access, and we do not find the *De Bruyn* court's reasoning persuasive. Moreover, *De Bruyn* is currently on appeal to the Michigan Supreme Court.

DeCoster had knowledge of, consented to, and directed the actions of his supervisors.

■ The court's determination that De-Coster is personally liable for violating the Civil Rights Act is a conclusion of law which we review for error. The critical part of the Maine Civil Rights Act reads: "Whenever any person, ... intentionally interferes or attempts to intentionally interfere by physical force or violence...." 5 M.R.S.A. § 4681 (Supp.1993). The Superior Court found that DeCoster directed the actions of his supervisors and those supervisors repeatedly used threats of physical force and violence to interfere with the rights of the tenants living on DeCoster's property. Although DeCoster argues that he cannot be held liable under the theory of respondeat superior, this is not a situation in which an employer is being held liable for the acts of agents who are acting within the scope of their employment. In this case DeCoster directed the acts; the acts are his acts, and he is personally liable under the Civil Rights Act.

■ DeCoster next argues that the injunction, which prohibits "placing or maintaining a sign in front of DeCoster housing instructing persons either not to enter, not to trespass, or to seek permission from the office before visiting" is too broad. We review a trial court's issuance of an injunction for abuse of discretion, and the factual findings underlying the exercise of that discretion for clear error. *Spickler v. Dube,* 644 A.2d 465, 467 (Me.1994). Because this injunction is remedial in nature, the trial court has broad discretion to "fashion an appropriate remedy to do complete justice." *State v. Bob Chambers Ford, Inc.,* 522 A.2d 362, 366 (Me.1987) (citation omitted). Moreover, we have previously held that "[t]he court's equitable powers assume an especially broad and flexible character when ... the public interest is involved." *Id.* at 366–67. Evidence before the trial court showed that in the context of explicit threats of force and violence, the sign had been used to create an atmosphere of fear and intimidation, and that it continued to deter visitors to the mobile home park. Based on a review of the record we cannot say that the court abused its discretion in fashioning an equitable remedy to

protect the public interest and prevent continued violation of the Civil Rights Act.

## II.  Unfair Trade Practices Act

■ The State argues that the Superior Court erred both in concluding that the UTPA does not apply in this case because the relationship between DeCoster and his employee tenants does not constitute "trade or commerce," and in holding that the UTPA does not apply to leases. The court's conclusion that the relationship between the parties is not "trade or commerce" is a conclusion that we independently review. Because we conclude that the relationship between De-Coster and his employee tenants is not "trade or commerce," we need not consider the applicability of the UTPA to leases.

"Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are prohibited by § 207 of the UTPA. 5 M.R.S.A. § 206 (1989). "Trade or commerce" is defined to include:

> the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this State.

5 M.R.S.A. § 206(3) (1989). The UTPA declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 5 M.R.S.A. § 207 (1989). The fact that we conclude that DeCoster's acts are violative of the Civil Rights Act and therefore unlawful does not compel the conclusion that the UTPA is applicable to the relationship between DeCoster and his employees. The relationship between DeCoster and the workers is not *only* a landlord-tenant relationship. It is primarily an employer-employee relationship.

The UTPA has been held inapplicable to disputes between employers and employees. *Manning v. Zuckerman,* 388 Mass. 8, 444 N.E.2d 1262 (1983). When longtime editor of the Atlantic Monthly Magazine, Robert J.

Manning, sought relief from his employer, Mortimer B. Zuckerman, pursuant to the provisions of the Massachusetts version of the UTPA, the Massachusetts Supreme Court noted that the UTPA "was intended to refer to individuals acting in a business context in their dealings with other business persons and not to every commercial transaction whatsoever." *Id.* 444 N.E.2d at 1263. The court noted:

> The Legislature originally enacted [the UTPA] to improve the commercial relationship between consumers and businessmen. By requiring proper disclosure of relevant information and proscribing unfair or deceptive acts or practices, the Legislature strove to encourage more equitable behavior in the marketplace.

*Id.* at 1264.

It went on to say:

> However, broad as this protection is, we believe that the Legislature did not intend the statute to cover employment contract disputes between employers and the employees who work in the employer's organization, nor to disputes between members of that organization arising out of the employment relationship.

*Id.* at 1265.

DeCoster and his employees are not engaged in trade or commerce with each other. The landlord-tenant relationship between DeCoster and his employees arises solely from their employer-employee relationship. The landlord-tenant relationship lasts only as long as the employer-employee relationship, and the services are offered only to employees rather than to the public in a business transaction. The determination of tenancy for the purposes of the applicability of the Maine Civil Rights Act does not require the leap that DeCoster is in the business of renting homes, and the facts do not support it. DeCoster offers homes to his employees as an integral part of business he is in, that of the production, sale and distribution of brown eggs. *State v. Shack* recognized the problem in attempting to affix one label to the situation:

> We see no profit in trying to decide upon a conventional category and then forcing the present subject into it. That approach would be artificial and distorting. The quest is for a fair adjustment of the competing needs of the parties, in the light of the realities of the relationship between the migrant farm and the operation of the housing facility.

*State v. Shack*, 58 N.J. 297, 277 A.2d 369, 374 (1971).

A tenancy arising from one's employment is beyond the broad language of the UTPA under which "any trade or commerce directly or indirectly affecting the people of this State" is included. The *Manning* court's reasoning applies equally in Maine:

> By enacting the broad standard of coverage under [the UTPA], the Legislature provided protection not only for specific individuals involved in a transaction, but also for the public as a whole. Through the imposition of penalties for specific unfair or deceptive acts or practices between particular individuals, the statute seeks to deter these practices and to reduce the general danger to the public arising from the potential for such unscrupulous behavior in the marketplace. Contract disputes . . . are principally "private in nature" and do not occur in the ordinary "conduct of any trade or commerce" as contemplated by the statute.

*Manning v. Zuckerman*, 444 N.E.2d at 1265–66.

The relationship between DeCoster and his workers is an employer-employee relationship. Although "trade or commerce" is defined to include the sale of real property, in this instance, to the extent there is a "sale" such sale is incident to and a part of the employment relationship. We find nothing in legislative history of UTPA to support a conclusion that the Legislature intended that the UTPA be applicable to the relationship between employers and employees. Our Legislature has acted extensively to regulate the relationship between an employer and an employee but has never implicitly or explicitly in such legislation made the UTPA applicable to labor relations. We decline to act where the Legislature has seen no need to act.

The entry is:

Judgment affirmed.

GLASSMAN and CLIFFORD, JJ., concurring.

WATHEN, Chief Justice, with whom LIPEZ, Justice, joins, concurring in part and dissenting in part:

I agree with the Court that there is no clear error in the Superior Court's decision that defendant violated the Maine Civil Rights Act and that the issuance of an injunction was within the court's discretion.

I respectfully dissent, however, from the conclusion that the Unfair Trade Practices Act (UTPA) is not applicable to the relationship between DeCoster and the workers because they are his employees. The fact that the relationship between DeCoster and the workers is not only a landlord-tenant relationship, but also an employer-employee relationship does not remove the transaction from the protection of the UTPA.[1] DeCoster's workers, although employees, are tenants under Maine law and this dispute occurred in the context of the parties' landlord-tenant relationship. Having declined to create a separate category for "tenancies incident to employment" with respect to property law and the Civil Rights Act, it is particularly illogical to fashion an identical categorical exception for the UTPA.

The fact that DeCoster's primary business is the production of eggs and not the rental of mobile homes does not negate the fact he has leased housing to the workers. There is nothing in the statutory definition of "trade or commerce" that would justify the conclusion that the UTPA applies only to transactions involving the primary business of the seller. Sellers frequently market goods and services, ancillary to their primary business, to limited and distinct portions of the consuming public. For example, a hospital may lease televisions only to its patients, or a food processor may sell by-products to a cattle feeding operation. Furthermore, sellers are increasingly marketing goods and services to their employees. A recent news article reported this trend and catalogued some of these goods and services: an in-house concierge procures theater tickets and resells them to employees; a company cafeteria prepares and sells party food to employees; a company maintenance worker acts as the corporate home handyman doing repair work and painting for employees; a corporate garage does maintenance jobs and inspections on employee automobiles. Amy Saltzman, *Little Conveniences That Make a Hit*, U.S. News & World Report, January 16, 1995. These businesses are certainly engaged in trade or commerce notwithstanding the fact that the sales are not made to the general consuming public.

It would be illogical to conclude that a seller is prohibited from engaging in unfair or deceptive practices in its primary business, but free to do so in a subsidiary business, or that he is prohibited from engaging in such practices in his dealings with the public, but free to do so in his dealings with members of the public who also happen to be in his employ. The fact that DeCoster's workers are only a small portion of the general consuming public and that rental housing is not DeCoster's primary business does not detract from the workers' status as consumers of housing. We have stated that consumer protection statutes should be liberally construed to effectuate their "beneficent" purposes. *Tanguay v. Seacoast Tractor Sales, Inc.*, 494 A.2d 1364, 1367 (Me. 1985). This Court's conclusion that tenants on an employer's property are not protected under the UTPA needlessly denies those tenants protection from abuse in one of the most basic of consumer goods—housing.

---

1. The majority cites *Manning v. Zuckerman*, 388 Mass. 8, 444 N.E.2d 1262 (1983) to support its determination that the UTPA is inapplicable to this dispute. Robert J. Manning, editor of a magazine owned by Mortimer B. Zuckerman, sought relief when his employer refused to pay additional retirement benefits allegedly due under his employment contract. The court, after determining that Zuckerman and Manning stood only in an employer-employee relationship, found that if the "defendant committed any unfair or deceptive acts, they *necessarily* occurred in the context of the parties' employment relationship ..." *Id.* 444 N.E.2d at 1264 (emphasis added). In the instant case, the parties, in addition to being employer and employee, stand in a landlord-tenant relationship, which is subject to protection by the UTPA.

898

Because the Court concluded that the relationship between DeCoster and the workers is not "trade or commerce," it did not reach the question of whether the UTPA is applicable to leases. I would find that the statutory definition of "trade or commerce" does encompass the leasing of property. The definition explicitly covers the sale of property and leases are nothing more than the sale of an interest in property. This conclusion is confirmed by 14 M.R.S.A. § 6030 (1980 & Supp. 1993), which expressly states that specific leasing practices are unfair and deceptive practices under the UTPA.

I would vacate the judgment dismissing the State's claim under the Unfair Trade Practices Act, and remand for further proceedings to determine whether defendant's actions constitute a violation of the UTPA.