Filed 2/18/22

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| JILL LAFACE, | B305494 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC632679) |
| v. | |
| RALPHS GROCERY COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Patricia Nieto, Judge. Affirmed.

Knapp, Petersen & Clarke, André E. Jardini, K.L. Myles, Greta T. Hutton; Capstone Law, Ryan Y. Wu, Melissa Grant, John Stobart; Law Offices of Michael V. Jehdian and Michael V. Jehdian for Plaintiff and Appellant.

Morrison & Foerster, Tritia M. Murata, Wendy J. Ray, Karen J. Kubin, James R. Sigel and Michael F. Qian for Defendant and Respondent.

Fisher & Phillips, Christopher C. Hoffman, Megan E. Walker and Darcey M. Groden for California New Car Dealers Association as Amicus Curiae on behalf of Defendant and Respondent.

Plaintiff Jill La Face appeals from the judgment entered following a bench trial in her representative action against Ralphs Grocery Company under the Private Attorneys General Act seeking civil penalties for alleged violations of labor law workplace seating requirements. We reject her contention that she was entitled to a jury trial and affirm the trial court's finding that Ralphs was not required to provide seating for its cashiers.

## FACTS AND PROCEDURAL HISTORY[1]

The Private Attorneys General Act (Lab. Code, § 2698, et seq. (PAGA)) allows employees to bring a civil action for penalties against their employer on behalf of themselves and other current and former "aggrieved" employees for Labor Code-related violations.[2] (§ 2699, subds. (a),(f).)

Appellant Jill La Face worked as a cashier at a store owned by respondent Ralphs Grocery Company. She brought a PAGA action against Ralphs on behalf of herself and other current and former Ralphs cashiers, alleging that Ralphs violated an Industrial Welfare Commission (IWC) wage order that required employers to provide suitable seating when the nature of the work reasonably permitted the use of seats, or, for a job where standing was required, to provide seating for employee use when their use did not interfere with an employee's duties.[3]

---

[1] Plaintiff and appellant Jill La Face died while this appeal was pending and before her appellant's reply brief could be filed. Appellant's counsel filed a reply brief on her behalf, prompting both respondent's motion to strike the reply brief and a motion by appellant's counsel to substitute another former Ralphs employee as the appellant. (Cal. Rules of Court, rule 8.36.) Rather than determine whether substitution is permissible in this type of action, we exercise our discretion to consider the reply brief and decide the appeal on its merits because it presents a continuing issue of public interest. (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 524, fn. 1; *People v. Nottoli* (2011) 199 Cal.App.4th 531, 535, fn. 3; *Dority v. Superior Court* (1983) 145 Cal.App.3d 273, 276.) Accordingly, we deny respondent's motion to strike the reply brief and deny without prejudice the motion to substitute in a new appellant on the ground that it is now moot.

[2] All further undesignated section references are to the Labor Code.

[3] Only the latter portion of appellant's PAGA claim is at issue on appeal.

2

The trial court set the matter for a jury trial but later granted Ralphs's motion for a bench trial after finding that PAGA actions were equitable in nature and were therefore not triable to a jury.[4]  A 12-day bench trial was held between November and December 2019, where ergonomics experts and Ralphs employees and supervisors testified for both sides.  The trial court found that Ralphs had not violated the applicable wage order because the evidence showed that even when lulls occurred in a cashier's primary duties, the cashiers were still required to move about the store fulfilling various other tasks.[5]

## DISCUSSION

A.    *The Right to a Jury Trial*

1.    *PAGA*

California's Labor Code includes numerous statutes "designed to protect the health, safety, and compensation of workers." (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 80 (*Kim*).)  Some statutes allow employees to sue for damages, typically in the form of wage compensation.  (See, e.g., § 1194.)  Others allow the Labor Commissioner to issue citations and bring administrative proceedings to recover lost wages on behalf of affected employees or to impose regulatory penalties for various forms of employer misconduct.  (See, e.g., § 225.5.)  Others vest the right to assess and recover statutory penalties in the Labor Commissioner only.  (See, e.g., § 226.3.)

The Labor Commissioner's ability to enforce these provisions was hampered by several factors.  Some code sections were designated as misdemeanors, as to which no penalties attached.  Others included penalty provisions, but a shortage of government resources hampered enforcement.  (See *Kim, supra,* 9 Cal.5th at p. 81; *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 379 (*Iskanian*).)  The Legislature enacted

---

[4] Ralphs also contended that appellant had waived her right to a jury trial by not posting her jury fees on time.  (Code Civ. Proc., § 631, subd. (f)(5).)  The trial court did not address this issue when it ordered a bench trial and, given our holding that there is no jury trial right here, neither will we.

[5] We will discuss the law and facts concerning the merits of appellant's claim in detail in section B. of our Discussion.

PAGA in 2003 to address these issues by adding penalties in specified amounts for statutes that did not provide for them, with penalties remaining in the amounts statutorily set for other provisions.  (*Iskanian, supra,* 59 Cal.4th at p. 379; § 2699, subds. (a),(f) & (g).)[6]

PAGA provides that, "[n]otwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor Workforce Development Agency [(LWDA)] or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in Section 2699.3."  (§ 2699, subd. (a).)  The same is true of aggrieved employees seeking PAGA relief based on Labor Code statutes that do not provide for civil penalties.  (§ 2699, subds. (f),(g).)

Penalties recovered in a PAGA action are divided between the state and all employees on whose behalf the action was maintained, with 75 percent going to the state and the rest divided among the aggrieved employees.  (§ 2699, subd. (i).)  Whenever the LWDA or any of its constituent organizations has discretion to assess a civil penalty, "a court is authorized to exercise the same discretion, subject to the same limitations and conditions, to assess a civil penalty."  (§ 2699, subd. (e)(1).)  In any PAGA action, however, whether under a statute that provides for a penalty or one that does not, "a court may award a lesser amount than the maximum civil penalty amounts specified by this part if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory."  (§ 2699, subd. (e)(2).)

Section 2699.3 sets forth the procedures to be followed to pursue a PAGA action.  Before commencing a PAGA action, the would-be plaintiff must give notice to the LWDA, and no action can be brought until the LWDA either notifies the plaintiff that it does not intend to investigate the claim, or 60 days have passed without such notice being given.  Actions based on

---

[6] Given that PAGA has been in effect more than 18 years, we are surprised that it took so long for the jury trial issue to present itself for appellate review.

PAGA code violations not listed in section 2699.5 are also subject to being cured by the employer against whom the PAGA action is proposed. (§§ 2699.3, subds. (a)(c); 2699.5.)

    2.    *Determining the Right to a Jury Trial In Civil Cases*

Under California law, the right to a jury trial may be afforded by statute or pursuant to Article I, section 16 of the California Constitution. (*Nationwide Biweekly Administration, Inc. v. Superior Court of Alameda County* (2020) 9 Cal.5th 279, 296-297 (*Nationwide Biweekly*).) Although the Legislature may grant that right where the state constitution does not require it, the Legislature's decision to expressly deny that right is trumped where the constitutional right exists.[7] (*Id.* at p. 297.)

Article I, section 16 of the California Constitution states that "[t]rial by jury is an inviolate right and shall be secured to all.…" This provision was intended to preserve the right to a civil jury trial as it existed at common law in 1850 when this section became part of the state's constitution. (*Nationwide Biweekly, supra,* 9 Cal.5th at p. 315, citing *People v. One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 286-287 (*One 1941 Chevrolet Coupe*).) That right "'is a purely historical question, a fact which is to be ascertained like any other social, political or legal fact. The right is the historical right enjoyed at the time it was guaranteed by the Constitution.'" (*Ibid.,* citation and fn. omitted.) Whether a jury trial right exists here under the state

---

[7] Both parties seem to agree that PAGA does not confer a right to jury trial and that our inquiry is limited to whether the constitutional jury trial right exists. Ralphs also contends that the Legislature intended PAGA actions be tried to the courts, pointing to language in the statute that expressly allocates to the courts the discretion to assess penalties or to reduce the amount of penalties. We agree with Ralphs that this at least suggests the Legislature intended that PAGA actions be tried to the courts, not juries. (*Nationwide Biweekly, supra,* 9 Cal.5th at p. 299.) Either way, however, our inquiry turns solely on whether the constitutional right to a jury trial exists. (*Id.* at p. 297; *Shaw v. Superior Court* (2017) 2 Cal.5th 983, 994 [where language and legislative history of a statute do not indicate whether the Legislature intended to create a jury trial right or not, the existence of a jury trial right is determined under the state constitution].)

constitution is an issue of law subject to de novo review.  (*Jogani v. Superior Court* (2008) 165 Cal.App.4th 901, 904.)

As a general matter, therefore, the California Constitution affords a right to a jury trial in common law actions at law that were triable by a jury in 1850, but not to suits in equity that were not triable by a jury at that time. (*C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 8-9.) Under this test, it is the substance of a cause action – not its title or form – that is controlling.  (*Nationwide Biweekly, supra,* 9 Cal.5th at p. 315.)  In making this evaluation we look to the gist of the action:  whether the nature of the rights involved and the facts of the particular case show that it is legal and therefore cognizable at law.  (*Ibid*.)

At early common law, actions at law typically involved lawsuits to recover money damages for injuries caused by breach of contract or tortious conduct.  Equitable causes of action typically sought relief such as injunctions, orders for specific performance, or the disgorgement of ill-gotten gains, which were unavailable in actions at law.  (*Nationwide Biweekly, supra,* 9 Cal.5th at pp. 292-293.)[8]

A leading case in this area is *One 1941 Chevrolet Coupe, supra,* 37 Cal.2d 283.  At issue there was whether a lawsuit by the government seeking forfeiture of a car allegedly used to transport drugs required a trial by jury. The court held that a jury trial was required because, at common law, similar causes of action for the forfeiture of lawful property used for unlawful purposes were triable to a jury.  (*Id.* at pp. 297-300.)  Nor did it matter that the statute at issue was enacted after 1850.  Because the constitutional right to a jury trial is broadly construed, it applies to newer causes of action that are of like nature or of the same class as a pre-1850 common law cause of action.  (*Id.* at p. 300; *Franchise Tax Board v. Superior Court* (2011) 51

---

[8] "The abolishment of the distinction between forms of proceedings in actions at law and suits in equity was made by the adoption of the Civil Practice Act of California in 1850.  This reform being adopted practically at the same time as the formation of the state government, the distinctions between procedure in law and equity have been practically unknown to California law."  (Parma, *The History of the Adoption of the Codes of California*, (1929) 22 Law Libr. J. 8, 12.)

Cal.4th 1006, 1012 (*Franchise Tax Board*) [courts examine claims arising under a modern statute to see if they are of "like nature" or "of the same class as a common law right of action"].)

  3. *The Parties' Contentions*

  Appellant contends that there is a right to a jury trial in PAGA actions because: (1) they are actions for civil penalties, which historically have been deemed actions at law that were tried to juries; (2) the factual inquiries in PAGA actions are typically straightforward and mechanical and therefore do not pose complex and sophisticated issues best suited to resolution by the courts; (3) PAGA actions are qui tam actions, which traditionally are tried by juries; and (4) they arise out of the employment relationship and are therefore akin to common law causes of action for breach of contract.

  Respondent contends that there is no right to a jury trial in a PAGA action because: (1) PAGA is a modern statutory innovation unknown at common law; (2) PAGA plaintiffs act as proxies for the state, enforcing statutory regulations that the state adjudicates through administrative proceedings that are reviewable in court actions without juries; (3) although penalties are the sole remedy in PAGA actions, that remedy is subject to equitable considerations at the court's discretion, making the remedy less legal and more equitable; (4) qui tam actions do not always require jury trials; and (5) because PAGA claims are essentially disputes between the state and employers, they are not contractual in nature.

  4. *PAGA Actions Are Substitutes for Administrative Proceedings*

  "A PAGA claim is legally and conceptually different from an employee's own suit for damages and statutory penalties. An employee suing under PAGA 'does so as the *proxy or agent of the state's labor law enforcement agencies.*' Every PAGA claim is 'a dispute between an employer and the state.' Moreover, the civil penalties a PAGA plaintiff may recover on the state's behalf are distinct from the statutory damages or penalties that may be available to employees suing for individual violations. Relief under PAGA is designed primarily to benefit the general public, not the party bringing the action." (*Kim, supra,* 9 Cal.5th at p. 81, citations omitted, emphasis in original.) A PAGA action is therefore a type of qui tam action, except that a portion of the penalty recovered goes to all employees affected by the Labor

Code violation. The state agency on whose behalf the suit is prosecuted always remains the real party in interest. (*Ibid.*)

In *Iskanian, supra,* 59 Cal.4th 348, our Supreme Court explained in detail why PAGA actions were exempt from arbitration under the Federal Arbitration Act (FAA). Because PAGA plaintiffs act as proxies for the state's labor law enforcement agencies, they represent "*the same legal right and interest*" as those agencies: the "recovery of civil penalties that otherwise would have been assessed and collected by the [LWDA]." (*Id.* at p. 380, italics added.) PAGA "authorizes a representative action only for the purpose of seeking statutory penalties for Labor Code violations and "*an action to recover civil penalties 'is fundamentally a law enforcement action designed to protect the public and not to benefit private parties.*'" (*Id.* at p. 381, citation omitted, italics added.) The civil penalties recoverable under PAGA are distinct from the statutory damages that employees may seek in their individual capacities. (*Ibid.*) A PAGA action "'functions as a substitute for an action brought by the government itself.'" (*Id.* at p. 387, citation omitted.)

"Simply put, a PAGA claim lies outside the FAA's coverage because it is not a dispute between an employer and an employee arising out of their contractual relationship. It is a dispute between an employer and the *state. . . .*" (*Iskanian, supra,* 59 Cal.4th at p. 386, original italics.)[9] Even though only aggrieved employees may bring PAGA actions, the character of the litigant or the dispute remain unchanged: PAGA actions are representative actions on behalf of the state. (*Id.* at p. 387; *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1197 [PAGA does no more than allow private parties "to recover penalties that previously could have been recovered only by the state Labor Commissioner.")

Synthesizing these decisions, a PAGA action is an administrative enforcement action conducted in court on behalf of the state by an aggrieved employee who possesses "the same legal right and interest" as the state. (See *Iskanian, supra,* 59 Cal.4th at 380.) However, that legal right and interest

---

[9] Based on this, we reject appellant's contention that there is a right to a jury trial in PAGA actions because they are analogs of common law breach of contract actions.

does not include the right to a jury trial. (*McHugh v. Santa Monica Rent Control Board* (1989) 49 Cal.3d 348 (*McHugh*).)[10]

The Labor Code includes penalty provisions that are reviewed by way of administrative mandate or by a trial de novo following an informal hearing process that may be requested after the issuance of an administrative citation. (§§ 98-98.2 [Labor Commissioner is authorized to investigate employee complaints, issue citations awarding unpaid wages or penalties, and hold informal hearings that are reviewed by a trial de novo in superior court]; §§ 226-226.5 [authorizing review by administrative mandate after informal hearing for citation issued due to failure to properly itemize wages and deductions on pay stub]; §§ 558, 1197.1 [citations imposing penalties for violations of IWC orders follow the citation and informal hearing process, with review by administrative mandate].)

Both review processes – administrative mandate and trial de novo – occur without a jury. (Code Civ. Proc., §1094.5, subd. (a) [administrative mandate is heard by the court sitting without a jury]; *Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 367-368 italics added [at trial de novo following administrative hearing under section 98.2, the court "hears the evidence anew" and "reach[es] *its* decision based on that new evidence . . ."].)

As the decisions cited above make clear, PAGA plaintiffs stand in the shoes of the administrative agency and possess the same right and interest as it does. The nature of that right is administrative regulatory enforcement,

---

[10] The *Mc Hugh* court affirmed the right of a city's rent control board to adjudicate a tenant's claim against his landlord for excessive rent charges, rejecting the landlord's claim that he was entitled to a jury trial instead. The court first noted that the gist of the action test was not applicable to adjudication of a dispute between private parties in an administrative forum. (*McHugh, supra,* 49 Cal.3d at p. 380; accord *Franchise Tax Board, supra,* 51 Cal.4th at p. 1011.) Administrative agencies may hold hearings to adjudicate issues that fall within the scope of their primary and legitimate regulatory purposes so long as they are authorized to do so by statute. Such actions do not contravene the state constitution's judicial powers doctrine so long as those decisions are subject to judicial review by the courts. (*McHugh, supra,* at pp. 359, 372; Cal. Const., art. VI, § 1.)

which occurs in administrative proceedings and which is subject to judicial review without a jury trial right.

5. *PAGA Penalty Awards Are Subject To The Application of Several Equitable Factors*

PAGA permits the courts to award less than the maximum penalty authorized "if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." (§ 2699, subd. (e)(2).) Ralphs contends, appellant concedes, and we agree, that these factors are equitable in nature. Other courts considering the effect of similar penalty provisions have found them to be factors that weigh against the existence of a jury trial right.

The court in *DiPirro v. Bondo Corporation* (2007) 153 Cal.App.4th 150 (*DiPirro*) considered whether there was a right to jury trial in an action brought under the Safe Drinking Water and Toxic Enforcement Act of 1986. (Health & Saf. Code, §§ 25249.5-25249.13 (Proposition 65).) Like PAGA, Proposition 65 allows for enforcement by the state or by private plaintiffs on the state's behalf. (*DiPirro, supra,* 153 Cal.App.4th at pp. 183-184; Health & Saf. Code, § 25249.7, subd. (c).)

Proposition 65 provides for equitable remedies in the form of injunctive and declaratory relief. It also provides for civil penalties, subject to an array of factors. These include: the nature and extent of the violation; the number and severity of the violations; the economic effect on the violator; whether the violator made good faith efforts to comply with the law; the willfulness of the violator's misconduct; and any other factor justice requires. (Health & Saf. Code, § 25249.7, subd. (b)(1).) (*DiPirro, supra,* 153 Cal.App.4th at pp. 181-183.)

The legal remedy of damages sought under Proposition 65 by way of civil penalties is subject to equitable principles through consideration of the several factors listed in the statute. (*DiPirro, supra,* 153 Cal.App.4th at p. 182.) This highly discretionary consideration of multiple factors "that do not primarily take into account any harm suffered by the plaintiff . . . [is] the kind of calculation traditionally performed by judges rather than a jury . . . ." (*Id.* at p. 182.) The combination of equitable remedies and equitable

10

penalties rendered Proposition 65 actions equitable, not legal, thereby precluding the right to a jury trial. (*Id.* at pp. 182-184.)

The court in *Nationwide Biweekly, supra,* 9 Cal.5th 279, relied in part on this analysis when holding that actions under the Unfair Competition Law (Bus. & Prof. Code, § 17200, et seq. (UCL)) and the False Advertising Law (Bus. & Prof. Code, § 17500, et seq. (FAL)) were equitable and therefore not triable to a jury.

At common law, consumers had no claim for unfair competition, and trademark or trade name infringement actions could be brought only by businesses adversely affected by such conduct. (*Nationwide Biweekly, supra,* 9 Cal.5th at p. 322.) The UCL and FAL were enacted to create new rights and remedies not available at common law, broadening the types of business practices that could be considered unfair competition. They also authorized both the government and injured private individuals to sue for restitution, injunctive relief, and other equitable remedies. (*Id.* at pp. 322-323.) Both also included penalty provisions subject to identical equitable considerations: the nature, seriousness, and persistence of the misconduct; its duration; defendant's willfullness; and defendant's net worth. (Bus. & Prof. Code, §§ 17207, subd. (b); 17536, subd. (b).)

The *Nationwide Biweekly* court was aware of *One 1941 Chevrolet Coupe's* description of early English common law penalty actions where jury trials were allowed, but did not believe that made UCL or FAL actions any less equitable. "Prior to 1850, early English law embodied numerous statutes imposing civil penalties for a variety of specifically delineated impermissible business practices – like using false weights and measures in the sale of a product or failing to pay the appropriate excise taxes due – that were enforced by the government through a civil action" where a jury was available. (*Nationwide Biweekly, supra,* 9 Cal.5th at p. 323, quoting *One 1941 Chevrolet Coupe, supra,* 37 Cal.2d at pp. 295-296 & fn. 15.) However, none of these statutes reached the types of novel but offensive business practices created by the UCL and FAL. (*Ibid.*) Based on this, along with the equitable remedies authorized by the UCL and FAL, and the equitable factors used to determine the amount of penalties awarded, the court held

11

that the state constitutional right to a jury trial did not attach to those statutory schemes. (*Id.* at pp. 324-327.)

6.     *There Is No Jury Trial Right in PAGA Actions*

We acknowledge that the nature of the remedy sought is an important, but not controlling, factor in determining whether an action is at law or in equity. (*Raedeke v. Gibraltar Savings & Loan Assn., supra,* 10 Cal.3d at p. 672.)[11]  We also acknowledge that actions for penalties have traditionally been considered actions at law that are triable to a jury.  However, the general proposition that actions at law are triable to juries is "not an absolute rule." (*Franchise Tax Board, supra,* 51 Cal.4th at p. 1011, 1012-1019 [although statutory tax refund actions were legal in nature, they came with no jury trial right because the authorizing statute created a new kind of action unknown at common law].)[12]

We understand appellant's contention that PAGA is just another action for a civil penalty and therefore an action at law triable by a jury.  But as set forth earlier, PAGA is not a garden variety civil penalty action.  Instead, it

---

[11] The most often cited source for this proposition is *One 1941 Chevrolet Coupe, supra,* 37 Cal.2d 283.  As part of its general discussion about the types of actions that were considered to be at law before 1850, the court quoted at length from various legal authorities, including the following:  "'Cases involving penalties to the Crown, other than forfeiture or conveyances and goods, were also tried by a jury in the court of Exchequer.'" (*Id.* at p. 295.)  Included as a footnote was a list of citations to several late 17th and early 18th century English decisions where penalties were sought during a jury trial.  These consisted primarily of actions for recusancy – failure to attend church – and customs and duties violations. (*One 1941 Chevrolet Coupe, supra,* at p. 295, fn. 15.)

[12] The *Franchise Tax Board* court cited several other similar examples.  Small claims actions are not entitled to jury trials even though they are typically legal, not equitable, because pre-1850 English law allowed for such cases to be tried without a jury. (*Franchise Tax Board, supra,* 51 Cal.4th at p. 1011.)  Neither were statutory tax collection proceedings even though their authorizing statute denominated them as actions at law. (*Id.* at p. 1012, citing *Sonleitner v. Superior Court* (1958) 158 Cal.App.2d 258, 261-262.)  Finally, citing *McHugh, supra,* 49 Cal.3d 348, the court reaffirmed that the gist of the action test did not apply in administrative proceedings. (*Franchise Tax Board, supra,* at p. 1011.)

contains several unique features that we conclude make it unlike any pre-1850 common law action and therefore unsuitable for a trial by jury.

First, as discussed above, PAGA is a civil action only in the sense that its designated forum is the trial courts. PAGA plaintiffs are still mere proxies for the state, bringing what would otherwise be an administrative regulatory enforcement action on its behalf. The action is still subject to the same legal rights and interests as the state (*Iskanian, supra,* 59 Cal.4th at p. 380), and that right does not include the right to a jury trial. (*McHugh, supra,* 49 Cal.3d at p. 348.) Moreover, judicial review of such proceedings occurs without a jury. (Code Civ. Proc., § 1094.5, subd. (a); *Smith v. Rae-Venter Law Group, supra,* 29 Cal.4th at pp. 367-368.) It seems anomalous to vest the state's proxies with more rights than the state would otherwise have on its own.

The administrative nature of PAGA actions is further underscored by two factors: First, it applies in part to Labor Code provisions that allow for a civil penalty to be "assessed and collected" by the LWDA. (§ 2699, subd. (a).) We take that to mean purely administrative enforcement. (See §200.5, subds. (a),(b) [labor agencies commence court actions to collect civil penalty assessments and fees].) Second, where the LWDA has discretion to assess a civil penalty, the courts are to exercise the *same discretion,* subject to *the same limitations and conditions* as the LWDA. (§ 2699, subd. (e)(1).) In short, for many PAGA actions the statue directs the courts to exercise the same discretion as would the Labor Commissioner, a task for which a jury seems unsuited.

Next, PAGA's penalty provisions are subject to a variety of equitable factors which, as both the *Nationwide Biweekly* and *DiPirro* courts pointed out, call for "the type of qualitative evaluation and weighing of a variety of factors that is typically undertaken by a court and not a jury." (*Nationwide Biweekly, supra,* 9 Cal.5th at p. 326; *DiPirro, supra,* 153 Cal.App.4th at p. 182.) This reasoning was also applied in *Mendoza v. Ruesga* (2009) 169 Cal.App.4th 270, which considered whether actions under the Immigration Consultants Act (Bus. & Prof. Code, § 22440, et seq. (ICA)) carried the right to trial by jury. The ICA permits the recovery of compensatory damages for misleading statements (Bus. & Prof. Code, § 22446.5, subd. (a)), which the

court held was comparable to a common law fraud cause of action and was therefore triable to a jury. (*Id.* at pp. 284-286.) However, the ICA also allows for the collection of civil penalties that are subject to a variety of equitable considerations (Bus. & Prof. Code, § 22445, subd. (a)(2)), and, as to those there was no such right. (*Id.* at p 285. fn. 9.)

We recognize that the penalties at issue in *Nationwide Biweekly* and *DiPirro* were found in statutes that also provided equitable remedies such as injunctive and declaratory relief, and that the equitable nature of the penalties formed only part of the court's analysis. Although not dispositive, we conclude that the equitable nature of the penalties permitted by PAGA is a factor – along with others – that we must consider.

Next, the Labor Code proscribes a wide range of conduct that we believe was unknown at common law, including the seating requirements at issue here, pay stub information violations, and retaliation against employees who bring complaints for Labor Code violations. We believe these and probably many others represent the kind of novel rights unknown at common law that animated the decision in *Nationwide Biweekly* because the UCL and FAL likewise created consumer rights that did not previously exist. (See *Nationwide Biweekly, supra,* 9 Cal.5th at pp. 322-327.)

Finally, appellant contends that the penalty assessment portion of PAGA actions can be severed from the liability portion, with the trial court deciding the former and the jury the latter. *Nationwide Biweekly* eschewed just that type of severance, however. (*Nationwide Biweekly, supra,* 9 Cal.5th at pp. 328-334 & fn. 22, [rejecting reliance on *Tull v. United States* (1987) 481 U.S. 412, which permitted severance of civil penalty phase from liability phase under statute where equitable relief was also provided].)

Although PAGA is an action for civil penalties, it is an administrative enforcement hybrid. If tried to a jury, the parties would gain a jury trial right not otherwise available to either the agency or employers. Many of the violations would be based on newly created rights that did not exist at common law. Jurors would be called upon to sometimes exercise the same discretion, subject to the same limitations and conditions, as the administrative agency on whose behalf the action was brought, when deciding whether to assess penalties in the first place. They would then be

14

asked to apply equitable principles to determine whether to reduce those penalties below the amounts set by statute. On balance, we cannot conclude that such an action has a pre-1850 common law analog that would call for the right to a jury trial under the California Constitution.

B.      *The Merits*

   1.      *The Evidence and Issues at Trial*

La Face's lone PAGA cause of action alleged that Ralphs failed to provide seating for her and other Ralphs cashiers, as required by IWC Wage Order 7-2000 (Cal. Code Regs. tit. 8, § 11070, subd. 14.), which states:[13]

> "14. SEATS
>
> (A)  All working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats.
>
> (B)  When employees are not engaged in the active duties of their employment and the nature of the work requires  standing, an adequate number of suitable seats shall be placed in reasonable proximity to the work area and employees shall be permitted to use such seats when it does not interfere with the performance of their duties."[14]

Stephen Morrissey, who was appellant's ergonomics expert, testified that he visited 15 Ralphs stores to observe cashiers at work. According to Morrissey, cashiers spent most of their time scanning items, interacting with customers, and bagging groceries. He noted that cashiers had other duties as well, such as "cleaning, stocking, and other duties as assigned depending on the amount of time available and so on."

---

[13] Appellant's original complaint included the Kroger Company – Ralphs corporate parent – as a defendant. She later dismissed Kroger from the action.

[14] For ease of reference, we will refer to these wage order provisions as Section 14(A) and Section 14(B). The statutory basis for PAGA relief asserted by appellant was section 1198, which provides for the promulgation of administrative wage orders that govern the wages, hours, and other conditions of employment. Appellant has abandoned her Section 14(A) claim and our recitation of the evidence is therefore limited to her Section 14(B) claim.

15

Morrissey said that cashiers did experience lulls in work, during which they would organize products or "go down the line" to look for customers ready to check out, which Ralphs calls "fishing for customers." Sometimes the cashiers would stay at their stations and wait, but there were no seating options available to them. On cross-examination, Morrissey agreed that he saw cashiers standing idle at their stations for no more than 20 or 30 seconds at a time. Otherwise, they were "looking for something to do and then going off and finding something to do and having to run back when customers show up."

Appellant LaFace testified that she had been employed at Ralphs for 32 years, the last eight as a cashier. About 90 percent of her workday as a cashier would be spent at the register. When a cashier was not busy checking out customers, "if you have a lot of change in your drawer, you would open your drawer, get your change, and fill up your changer. You could wipe down your area." On cross-examination, LaFace agreed that she was supposed to be fishing for customers if there were none in her checkout line.

John Yannoulatos testified that he had worked for Ralphs for 34 years, about 30 of those as a cashier. Yannoulatos spent most of his workday in the checkstand's cashier bay. When no customers were in line he was supposed to clean, organize product, or fish for customers. Yannoulatos stated that having something to rest on for very short periods throughout the day—"30 seconds, maybe a minute"—would be helpful.

Appellant called as a witness Brian Gray, an asset protection manager for Ralphs. Gray testified that when cashiers are not checking out customers, they will "face an aisle" (arrange product on the shelves), or assist in other departments.

Ralphs cashier Teresa Alvarez testified that cashiers would sometimes sit on the checkstand's bagging area. She also testified that Ralphs preferred cashiers to straighten products on shelves or fish for customers instead of resting.

Long-time Ralphs employee Howard Simmons testified that when cashiers were not checking out customers, they were supposed to be straightening magazines, stocking shelves, dusting, or cleaning the floor.

16

Ralphs called store manager Jane Pickett, who testified that the "best practice" for cashiers when no customers are in line is to fish for customers, clean, and restock items. Division front-end manager and Kroger sales manager Diane Wackeen testified that cashiers should have no idle time. When not performing their cashier duties, they should be cleaning their scanners and register areas, organizing, fishing for customers, or bagging for other cashier's customers. Ralphs sales manager Susan Albrecht testified that when cashiers were not actively checking out customers, they should be cleaning, putting away "go-backs," straightening, or fishing.

Jeffrey Fernandez, who was Ralphs's ergonomics expert, testified that when there were no customers to check out, cashiers "keep themselves busy by . . . going and fishing for customers, going and trying to get customers, drawing customers to their aisle, cleaning and restocking their supplies, and . . . arranging their go-backs."

Ralphs District Manager Michael Walker testified that when cashiers do not have customers in line, they can "do a whole slew of different responsibilities in the store. We have used them to fill dairy boxes, to bring out grocery loads late at night, to assist in produce, replenish shelves as they get depleted throughout the day, sometimes gum and candy a lot [*sic*]. I mean, there is always something to do in a grocery [*sic*] and the cashier is somebody that we would really expect to help out when there is downtime."

The court ruled in favor of Ralphs both from the bench and in a later written statement of decision. Relying on *Kilby v. CVS Pharmacy, Inc.* (2016) 63 Cal.4th 1 (*Kilby*), the court found that appellant "failed to prove any violation of section 14(B) of Wage Order No. 7."[15]

Relying on *Kilby*, supra, 63 Cal.4th at page 19, the trial court found that Section 14(B) applies if there are lulls in operation when an employee, while still on the job, is not then actively engaged in any duties. Section 14(B) does not require seats to be provided if doing so would interfere with employees' performance of their duties. (See Cal. Code Regs., tit. 8, § 11070, subd. 14(B).)

---

[15] We discuss *Kilby* in detail in the following section.

17

The trial court stated that appellant "and her witnesses agreed that Ralphs expects them, as part of their job duties, to keep busy and not stand around idly." The court found that "Ralphs cashiers are required, as part of their job duties, to be active and busy at all times, unless they are on their regulated work breaks, a fact which [appellant's] witnesses conceded. It is part of the job requirements for cashiers to always be active, and this was supported by the evidence presented at trial. [¶] The Court finds that [appellant] failed to present evidence at trial that supported any violation of Wage Order Section 14(B). Furthermore, it is the Court's findings that the testimony presented at trial overwhelmingly substantiates this conclusion."

2. *Kilby*

*Kilby, supra*, 63 Cal.4th 1, is the only reported decision to discuss Section 14(B). In that case, the United States Ninth Circuit Court of Appeals certified questions to the California Supreme Court arising from two separate actions regarding language in Sections 14(A) and (B) about the "nature of the work" and when that work "reasonably permits the use of seats."

In one of the two underlying lawsuits, plaintiff Kilby was employed by defendant CVS Pharmacy, Inc. (CVS). "Kilby's duties included operating a cash register, straightening and stocking shelves, organizing products in front of and behind the sales counter, cleaning the register, vacuuming, gathering shopping baskets, and removing trash. CVS did not provide Kilby a seat for these tasks," which Kilby alleged violated section 14. (*Kilby, supra*, 63 Cal.4th at p. 9.) In the other underlying lawsuit, plaintiff Henderson and three other bank tellers sued their employer, JPMorgan Chase Bank (Chase), alleging a violation of section 14. (*Id.* at p. 10.)

Examining the interplay between Sections 14(A) and 14(B), the *Kilby* court stated, "the IWC has stated that section 14(B) applies during 'lulls in operation' when an employee, while still on the job, is not then actively engaged in any duties. (IWC, 1976 Wage Orders, Summary of Basic Provisions, Seats, p. 3.) Taking [Sections 14(A) and 14(B)] together, if an employee's actual tasks at a discrete location make seated work feasible, he is entitled to a seat under section 14(A) while working there. However, if other job duties take him to a different location where he must perform standing tasks, he would be entitled to a seat under 14(B) during 'lulls in operation.'"

18

(*Kilby, supra*, 63 Cal.4th at p. 19, emphasis in original.) *Kilby* further stated that to determine whether seating is required, "[c]ourts should look to the actual tasks performed, or reasonably expected to be performed." (*Id.* at p. 18.)

###### 3.    *The Parties' Contentions*

The parties generally agree that the evidence showed that when cashiers were not checking out customers, Ralphs expected them to be cleaning, restocking, and fishing for customers. The parties disagree, however, whether that expectation constituted "lulls in operation" requiring seating under section 14(B) and *Kilby*.

Appellant contends it did not matter whether Ralphs expected its cashiers to stay busy with other tasks when there were no customers to check out. The "reality," appellant contends, is that many times cashiers would remain at their checkstands, talking to other employees or using their mobile phones. Ralphs's expectation that they should leave to assume other tasks was neither reasonable nor practicable, given that most of these down times were extremely brief. Finally, appellant contends that, under *Kilby*, determining whether lulls in operation occur should focus on a particular duty at a particular location, not on employee job duties in general.

Ralphs counters that Section 14(B) applies because it states that seating is required only "[w]hen employees are not engaged in the active duties of their employment" and when sitting "does not interfere with the performance of their duties." Because cashiers are required to be active and busy at all times, Ralphs contends there were no "lulls in operation" for which seating was required. According to Ralphs, "An employee cannot create an entitlement to seating under Section 14(B) simply by shirking job duties." It also contends that under *Kilby*, "the 'duties' at issue under 14(B) are defined by Ralphs, not . . . rogue employees."

###### 4.    *Analysis*

Because the parties agree that Ralphs expected its cashiers to take on other duties when no customers were in line, it appears that the issue before us involves the application of law to undisputed facts, with the issue limited to whether the absence of customers in line constituted a lull in operation under Section 14(B). Accordingly, we exercise de novo review. (*Boling v.*

19

*Public Employment Relations Board* (2018) 5 Cal.5th 898, 912-913.) Wage orders are "legislative regulations" that are " liberally construed to protect and benefit employees." (*Kilby, supra*, 63 Cal.4th at p. 11.) "When a wage order's validity and application are conceded and the question is only one of interpretation, the usual rules of statutory interpretation apply." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1027.) In interpreting a statute, courts examine the statutory language, giving it a plain and commonsense meaning. If the language is clear, courts must generally follow its plain meaning. (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.)[16]

*Kilby* touched only briefly on seating under Section 14(B), but provided sufficient guidance for the issue before us. The *Kilby* court observed that Section 14(B) applies during "'lulls in operation' when an employee, while still *on the job*, is not then actively engaged in any duties." (*Kilby, supra*, 63 Cal.4th at p. 19, emphasis in original.) One of the issues addressed in *Kilby* was whether the employer's "business judgment" was a factor to be considered in determining whether seating was required. (*Id*. at p. 8.) The court stated, "There is no question that an employer may define the duties to be performed by an employee. As the [Division of Labor Standards Enforcement] observes, '[a]n employer's business judgment largely determines the nature of work of the employee both generally, as well as duties or tasks specifically.'" (*Kilby, supra*, 63 Cal.4th at p. 21.) And in general, to determine whether seating is required "[c]ourts should look to the actual tasks performed, or reasonably expected to be performed." (*Id*. at p. 18.)

Appellant does not contend, and the evidence does not show, that any of the alternative duties cashiers were expected to perform could be carried out

---

[16] As set forth below, we alternatively conclude that even if the evidence is conflicting, there was substantial evidence that Ralphs did not violate Section 14(B). To the extent the evidence might be viewed as conflicting, we review the trial court's factual findings under the substantial evidence standard, resolving all conflicts, and drawing all inferences in favor of the judgment. To the extent we interpret Section 14(B), however, the usual rules of statutory construction apply. (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1478.)

while seated. Ralphs expected that while cashiers were not actively checking out customers, they would clean, restock, assist in other departments, or fish for customers. No evidence suggested these expectations were unreasonable, nor did appellant make such an argument. Despite these expectations, employees sometimes did not engage in their expected job duties. However, their decision to remain at their checkstands rather than perform their other expected tasks does not constitute a lull in the operation of those other duties.

Moreover, Section 14(B) provides for seats when sitting "does not interfere with the performance of [the employee's] duties." Sitting in or near the checkstands when there are no customers in line instead of cleaning, restocking, assisting other departments, or fishing, would interfere with the performance of the cashiers' other duties.

Appellant argues that if the trial court's approach is affirmed, "then any employer could avoid providing a seat under Section 14(B) by simply claiming that 'employees are always expected to be busy,' rendering the seating requirement illusory." Not so. *Kilby* made clear that an employer's mere preference for having employees standing—there, the employers' "judgment that employees provide better customer service while standing" (*Kilby, supra*, 63 Cal.4th at p. 21)—is not controlling.

Instead, "[t]he standard is an objective one. An employer's evaluation of the quality and effectiveness of overall job performance is among the factors that can be objectively considered in light of the overall aims of the regulatory scheme, which has always been employee protection. An objective inquiry properly takes into account an employer's reasonable expectations regarding customer service and acknowledges an employer's role in setting job duties. It also takes into account any evidence submitted by the parties bearing on an employer's view that an objective job duty is best accomplished standing." (*Kilby, supra*, 63 Cal.4th at pp. 21-22.)

The trial court's findings were based on the evidence presented about cashiers' job duties as a whole, not simply Ralphs's stated preferences about the nature of customer service. Witnesses called by both parties testified about the cashiers' duties, including the expectation that cashiers were supposed to stay busy even while not checking out customers. An expectation

21

that employees work while on the clock, rather than look at their phones or do nothing, seems objectively reasonable. There was ample evidence for the trial court to make an objective evaluation of the job duties as required by *Kilby*. We therefore find no error in the court's interpretation of Section 14(B) and *Kilby*.

Ralphs also contends that substantial evidence supports the trial court's findings. Appellant asserts, for the first time in her reply brief, that there was insufficient evidence to support the trial court's conclusions regarding section 14(B). "We generally do not consider arguments raised for the first time in a reply brief." (*Raceway Ford Cases* (2016) 2 Cal.5th 161, 178.)

Assuming for discussion's sake that the evidence was in conflict, we find no error. "When the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals, it is somewhat misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279.) "Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." (*Shaw, supra*, 170 Cal.App.4th at p. 279; see also *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838; *Petitpas v. Ford Motor Co.* (2017) 13 Cal.App.5th 261, 302.)

Appellant has not met this burden. The evidence showed that Ralphs's cashiers were supposed to stay busy when they were not checking out customers. The evidence does not support appellant's contention that there were lulls during which cashiers could sit in chairs while "not engaged in the active duties of their employment." (Section 14(B).) To the contrary, sitting at or near the checkstands instead of cleaning, restocking, and fishing for customers, would have interfered with the active duties of the cashiers'

employment.  Thus, the evidence supports the trial court's conclusion that the evidence did not support appellant's claim under Section 14(B).

## DISPOSITION

For the reasons set forth above, the judgment is affirmed.  Each party shall bear its own costs on appeal.

## CERTIFIED FOR PUBLICATION


MICON, J.*


We concur:


WILLHITE, ACTING P.J.


CURREY, J.

---

*Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.